Elihu B. Washburne, et al. [1] v. commissioner. Washburne v. Commissioner
Docket Nos. 581-66, 582-66, 693-66, 694-66.
United States Tax Court
T.C. Memo 1968-122; 1968 Tax Ct. Memo LEXIS 173; 27 T.C.M. (CCH) 577; T.C.M. (RIA) 68122; June 24, 1968, Filed Wright Matthews, Robert K. Sands, and O. Jan Tyler, 2524 Republic Nat'l Bank Bldg., Dallas, Tex., for the petitioners. John W. Dierker, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income taxes for the calendar year 1962 of Elihu B. Washburne and Mary W. Washburne in the amounts of $34,925.50 and $35,079.62, respectively, and determined deficiencies in the income taxes for the calendar year 1962 of Joe T. Starkey and Frances H. Starkey and of Fred Kiesow III and Jo Ann Kiesow in the amounts of $1,296.55 and $1,329.45, respectively. The issues for decision are: (1) Whether the stock received by petitioners Elihu B. Washburne, Joe T. Starkey, and Fred Kiesow III in Lane Wood and Company constituted income to them *174 to the extent of the fair market value of the stock or was received in a transaction on which no gain or loss is to be recognized under section 351, I.R.C. 1954. (2) If the stock received by petitioners Elihu B. Washburne, Joe T. Starkey, and 578 Fred Kiesow III represented taxable income to each of them to the extent of the fair market value of the stock received by each of them, what is the fair market value of the stock received by each of these petitioners on the date of its receipt, April 30, 1962. Findings of Fact Some of the facts have been stipulated and are found accordingly. Elihu B. Washburne and Mary W. Washburne are husband and wife who at the date of the filing of each of their petitions herein resided in Dallas, Texas. Individual Federal income tax returns for the calendar year 1962 were filed by Elihu B. Washburne and Mary W. Washburne with the district director of internal revenue at Dallas, Texas. Joe T. Starkey and Frances H. Starkey, husband and wife who resided at the time of the filing of their petition in this case in Dallas, Texas, filed a joint Federal income tax return for the calendar year 1962 with the district director *175 of internal revenue at Dallas, Texas. Fred Kiesow III and Jo Ann Kiesow, husband and wife who resided at the time of the filing of their petition in this case in Dallas, Texas, filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue at Dallas, Texas. Elihu B. Washburne (hereinafter referred to as Washburne), upon graduation from college, became a bank examiner for the Federal Reserve Bank of Chicago and held that position for 5 years. In 1947 he and two other individuals organized a company which engaged in the business of factoring accounts receivable. This company was located in Chicago and Washburne served as the treasurer of that company until 1953, when due to his wife's health he and his family moved to San Francisco, where Washburne became employed by the Oakland Bank of Commerce. In 1954 Washburne moved to Dallas, Texas, and became employed by Merchants' Factors Corporation, a Chicago firm, to develop and operate an accounts receivable factoring business for that firm in Dallas, Texas. In the spring of 1955 Washburne was attempting to organize his own factoring company. He was introduced to C.A. Sammons (hereinafter *176 referred to as Sammons) of Dallas, Texas. Sammons agreed to provide the cash funds for starting a factoring business with the understanding that the business would be a corporation and all of the stock would be owned by Sammons or interests owned by Sammons. Washburne was to be the president of the corporation and manager of the business. The corporation was organized as Lane Wood and Company. The corporation entered into an employment contract with Washburne under date of May 9, 1955, whereby it was agreed that Washburne would devote full-time to the factoring business of Lane Wood and Company and as compensation would receive a salary of $600 per month plus a sum equal to 20 percent of the net earnings of the factoring business of the corporation. The contract was for a 1-year period but was to continue on a month-to-month basis after the first year unless one party or the other gave 10 days' notice of intention to terminate the agreement. The contract provided further that Washburne would not associate himself with or engage in, directly or indirectly, any business whatsoever "which is in competition with Lane Wood and Company within 100 miles of Dallas, Texas, during a period of *177 2 years from the termination of his employment by Lane Wood and Company for any reason." Except for modifications increasing Washburne's monthly salary to $800 per month and changing his additional compensation to 20 percent of the first $50,000 of net earnings and 10 percent of net earnings in excess of $50,000, this employment contract between Washburne and Lane Wood and Company remained in force until the sale of the factoring business of Lane Wood and Company in 1962. Lane Wood and Company engaged in certain operations in addition to the factoring business but Washburne was in no way associated with these operations. Sammons was at the time Washburne became associated with him through his employment by Lane Wood and Company and for sometime prior thereto and throughout the year here in issue, engaged in the insurance and investment business in Dallas, Texas, primarily through a number of corporations, the stock of which he owned or controlled. In addition he owned or controlled approximately 60 separate corporations engaged in various enterprises. Lane Wood and Company (hereinafter referred to as Old Lane Wood) was 579 incorporated under the laws of the State of Delaware *178 on April 22, 1955. All of the issued and outstanding stock of Old Lane Wood was owned by four corporations owned or controlled by Sammons. The principal reason for the organization of Old Lane Wood was for the conduct of the factoring business which Washburne had persuaded Sammons to finance. T.A. Rose, Jr. (hereinafter referred to as Rose), has been employed since 1951 by Sammons Enterprises, Inc., which is a holding company for the investments of Sammons. Since his employment by Sammons Enterprises, Inc., Rose has served as investment officer and investment counsel for Sammons. During his entire period of employment by Sammons, Rose has served as the liaison man between Sammons and the officers of the various corporate enterprises which Sammons owned or controlled. From the date of the organization of Old Lane Wood in 1955 until April 30, 1962, Washburne's dealings with the stockholders of that company were conducted primarily by dealing with Rose. Washburne sent financial statements to Sammons but rarely saw and spoke with Sammons, and Sammons did not participate in the day-to-day operations of Old Lane Wood. Decisions regarding the operations of Old Lane Wood were made by Washburne *179 upon obtaining the approval of Rose. When the factoring business of Old Lane Wood was begun, Washburne was the only employee of that corporation engaged in that aspect of the corporate business. As the business grew, it was necessary to obtain other employees. Shortly after the formation of Old Lane Wood, Washburne employed Joe T. Starkey (hereinafter referred to as Starkey) as credit manager for Old Lane Wood and shortly thereafter he employed Fred Kiesow III (hereinafter referred to as Kiesow) as the accountant for the corporation. Starkey and Kiesow both remained in the employ of Old Lane Wood through April 30, 1962. The capital of Old Lane Wood was only $200,000. Because its loans were personally guaranteed by Sammons, the company was able to obtain bank loans in excess of $2 million at favorable interest rates. In addition funds were loaned to Old Lane Wood at favorable interest rates by other corporations owned or controlled by Sammons. From the time of its organization Old Lane Wood steadily grew in volume of business and its earnings steadily increased. As of December 31, 1961, Old Lane Wood had short-term and long-term debt in excess of $4 million. At any time that Washburne *180 was in need of funds for the factoring business of Old Lane Wood, he would discuss the matter with Rose and it was the general practice of Rose to call the First National Bank in Dallas and authorize an increase in loan by that bank to Old Lane Wood for use in the factoring business. Because of other balances maintained by various other corporations owned by Sammons with the First National Bank in Dallas, Old Lane Wood was not required to maintain compensating balances in that bank in order to obtain loans. From the time in 1955 when Washburne became employed by Old Lane Wood throughout the years he remained in its employ, his dealings with Rose and with Sammons were generally through personal conversations or telephone conversations. Very few documents other than monthly financial statements of the operations of the factoring business of Old Lane Wood were transmitted from Washburne to either Sammons or Rose. By mid-1961 Washburne had expanded the factoring business of Old Lane Wood to such an extent that its requirements for funds were reaching the level that loans in excess of the amounts which Sammons wished to guarantee for the company were being required. Also, by 1961 Washburne *181 had begun to make unsecured loans to certain of his factoring customers to enable them to acquire inventory to produce the products which they sold and which accounts were factored by Old Lane Wood. Sammons did not wish Old Lane Wood to make this type of loan and Washburne considered loans of this type necessary to the growth of the factoring business of Old Lane Wood. In the fall of 1961 representatives of Allied Finance Company (hereinafter referred to as Allied Finance) who were friends of Rose approached Rose with the proposition that Allied Finance might be interested in purchasing the factoring business or the stock of Old Lane Wood. Allied Finance at that time was controlled by Republic Insurance Company. It was at that time in the business of automobile financing but not in the factoring business. Prior to the time that representatives of Allied Finance approached Rose with respect to purchase of the factoring business 580 of Old Lane Wood, Rose had been discussing with Washburne, Sammons' dissatisfaction with the corporation's making unsecured loans to factoring customers. Rose told Washburne of the possible interest of Allied Finance in purchasing the factoring business *182 or stock of Old Lane Wood and arranged a meeting between the representatives of Allied Finance who had approached him and Washburne and himself. Rose and Washburne discussed with representatives of Allied Finance the possibility of the sale of the factoring business of Old Lane Wood or the stock of the corporation after all the assets other than those connected with the factoring business had been withdrawn from the corporation to Allied Finance at a price of book value plus $125,000. This discussion took place in the fall of 1961. During the course of the discussion it developed that if Allied Finance purchased the factoring business or stock of Old Lane Wood, it was likely that Washburne would not be allowed to operate the company with the lack of supervision over the day-to-day operations to which he had become accustomed with the ownership of the stock of the corporation under the control of Sammons. After some discussion Rose left the meeting with the representatives of Allied Finance and Washburne continued discussion with them. After concluding his discussions with representatives of Allied Finance, Washburne stated to Rose that operating the factoring business of Old Lane Wood *183 under the ownership of Allied Finance would not be a satisfactory arrangement to him, and Washburne asked Rose if some other arrangement could not be made. Rose then stated to Washburne that he would not further pursue the possibility of selling the factoring business to Allied Finance and for Washburne to see if he could find a purchaser for the business that "he could make a deal with." Rose did not turn the sale of the factoring business of Old Lane Wood over to a business broker and did not contact any prospective purchasers himself. Rose considered that at that time Washburne "was our agent." After his discussions with representatives of Allied Finance, Washburne discussed the desire of Sammons to sell the factoring business of Old Lane Wood with Starkey and Kiesow. He told Starkey and Kiesow about his conversations with representatives of Allied Finance and with Rose and reported to them that in his opinion a deal with Allied Finance would be very disadvantageous to the management of the factoring business of Old Lane Wood. Washburne stated to Starkey and Kiesow that he wanted their support if he reported to Sammons that the management of the factoring business would not remain *184 with the business if the business were sold to Allied Finance. He stated that if they would stand with him in opposing a sale of the factoring business of Old Lane Wood he would give them 10 percent of any interest he was able to acquire in any company that might purchase the factoring business of Old Lane Wood. After this discussion with Starkey and Kiesow, Washburne met with Sammons and told him that the management of the factoring business of Old Lane Wood would not remain with the business if it were sold to Allied Finance. Sammons assured Washburne that he would not sell the factoring business to anyone who was not satisfactory to Washburne, but reiterated that he did wish to sell the factoring business or the stock of Old Lane Wood and that he wanted to sell it for book value plus $125,000 after withdrawing assets not connected with the factoring business if the sale was to be of the stock. Sammons asked Washburne for his suggestions and Washburne suggested that he be given "a 60-day option with the company." He suggested that this not be a firm time because he might be negotiating on the 59th day and need a little extra time. Washburne, however, stated that if he had a 60-day *185 option on the company he believed he could "find a buyer." Shortly after Washburne's discussions with Sammons he met with a friend of his who was a representative of the Walter Heller Company. On several occasions this representative of Walter Heller Company had approached Washburne with the suggestion that Washburne become employed by Walter Heller Company since that company was considering opening an office in Dallas and needed an office manager. After Washburne talked with the representative of Walter Heller Company, that representative brought an officer of that company and an auditor down to Dallas and looked over the books of the factoring business of Old Lane Wood. After representatives of the Walter Heller Company had gone over the books of the factoring business of Old Lane Wood, Washburne introduced these individuals to Sammons and Rose. Washburne told the representatives of Walter Heller 581 Company that the price of the factoring business of Old Lane Wood was book value at the date of closing plus $125,000. However, the representatives of Walter Heller Company stated they would attempt to negotiate the price with Rose and Sammons and at a meeting with Rose and Sammons *186 did attempt such a negotiation. Sammons, however, was firm that the price for the sale of the factoring business of Old Lane Wood was book value at the date of closing plus $125,000. One of the terms which Walter Heller Company insisted upon if it was to buy the business was that the seller would guarantee the accounts which the company had at the date of the sale. Sammons was unwilling to sell on such terms and no sale resulted. Around Christmas of 1961 a friend of Washburne's introduced Washburne to Vincent Lynch (hereinafter referred to as Lynch). Washburne had told his friend that he was looking for a buyer for the factoring business of Old Lane Wood and the friend was of the opinion that perhaps Lynch would be interested in purchasing that business. Lynch had been employed for some years as vice president of Vought Industries, Inc., a subsidiary of Chance Vought Aircraft. In the fall of 1961 he had been of the opinion that Chance Vought Aircraft might be willing to make a sale of Vought Industries, Inc. Looking toward a purchase of this business, Lynch had been discussing with Charles Aberg (hereinafter referred to as Aberg), a lawyer practicing with a firm in Dallas, Texas, *187 the possibility of forming a limited partnership to be called Lynch, Aberg & Co. Lynch and Aberg had negotiated from about August 1961 until approximately Christmastime 1961 with a view to purchasing either the stock or business of Vought Industries, Inc., and just before Christmas negotiations with respect to this purchase had broken off and Lynch and Aberg had decided to look for another investment for Lynch, Aberg & Co. At the first meeting between Lynch and Washburne, which was held around Christmas in 1961, Washburne informed Lynch that he was president of Old Lane Wood and that he had founded the business with financial backing by Sammons in 1955. Washburne told Lynch of the growth record of the factoring business of Old Lane Wood and then informed Lynch that Sammons wished to sell that factoring business stating to Lynch that he (Washburne) had an option from Sammons to "sell the business." Washburne told Lynch that Sammons wished to obtain a premium of $125,000 over book value of the company's assets for the factoring business. Washburne asked Lynch if he would be interested in pursuing the matter further and Lynch said he would. After his conversation with Washburne, Lynch *188 discussed the possibility of purchasing the factoring business of Old Lane Wood with Aberg, telling Aberg that in his opinion this factoring business might be a logical first business acquisition for Lynch, Aberg & Co. if they could get the limited partnership formed. Sometime in January, 1962 Lynch met with Rose to discuss with him a number of questions with respect to the factoring business of Old Lane Wood and to satisfy himself that the business was for sale. Lynch was informed by Rose that Washburne did have an option from Sammons to sell the business. Also at this meeting, Rose confirmed the price which Sammons wanted for the business which Washburne had reported to Lynch. After this meeting Lynch and Aberg had further discussions and decided to proceed to negotiate with Sammons for the acquisition of the factoring business of Old Lane Wood. Having come to the conclusion to pursue negotiations for acquisition of the factoring business of Old Lane Wood, Lynch and Aberg had further discussions with Washburne and agreed with Washburne that he would, in consideration for his option, be granted 10 percent of the stock in the company which purchased the factoring business of Old *189 Lane Wood or stock of a face value of $100,000 whichever was greater. At this time no decision had been made as to what would be the capitalization of the company that might acquire the factoring assets of Old Lane Wood. Lynch and Aberg set up a meeting with Sammons in the latter part of February. At this meeting in addition to Sammons, Rose and Dave Smith, who was a legal advisor to Sammons, were present. Lynch and Aberg attempted to persuade Sammons to reduce the premium over book value of $125,000 but were informed that the price was firm and that Sammons would not discuss a reduction of the price. Lynch and Aberg left the room for a discussion between themselves. Previously, they had decided that if other aspects of a purchase of the factoring business of Old Lane Wood could be arranged they would accept the price of $125,000 above book value. Therefore, shortly they returned to the room in 582 which they were discussing the possible purchase of the business with Sammons and pursued other details of the terms of a sale of the factoring business. Before this meeting was concluded it was agreed that Lynch and Aberg would purchase the factoring business of Old Lane Wood if *190 they could arrange for the necessary loans and a line of credit for the corporation purchasing the business, and if agreeable exact terms of a sale could be worked out. Lynch and Aberg had their attorneys begin working on a sales agreement. Lynch and Aberg proceeded to form the limited partnership of Lynch, Aberg & Co. On September 7, 1961, Viking Corporation had been organized by Lynch and Aberg under the laws of the State of Texas. Lynch and Aberg decided to have this corporation acquire the factoring business of Old Lane Wood. When all the details of the proposed sale had been substantially worked out in late March of 1962, Washburne discussed with Lynch and Aberg whether arrangements could be made for his stock in the corporation which was to acquire the factoring business of Old Lane Wood to be received by him in a tax-free exchange. When Washburne had been dealing with representatives of Walter Heller Company, he had been discussing his receiving $20,000 of stock of Walter Heller Company if the sale of the factoring business of Old Lane Wood to that company were consummated. The stock of Walter Heller Company was traded on the New York Stock Exchange at that time. Washburne *191 did not consider that he was financially able to pay a tax on stock which he would plan or be required to keep and therefore thought that under the arrangement he would be making with the company which was to acquire the factoring business of Old Lane Wood, his stock in that company should be received by him in a tax-free exchange. Lynch and Aberg referred Washburne to their attorneys and he was given an opinion that in the transaction which was to be consummated, his stock could be received in a tax-free exchange. One of the attorneys in the firm to which Lynch and Aberg referred Washburne drafted a letter on Sammons' stationery, addressed to Washburne dated March 28, 1962, which read as follows: During December, 1961, we discussed the fact that for various reasons I want to sell the factoring business of Lane Wood and Company, which I own indirectly, in the near future. In view of our long and close relationship since the founding of this company to date, I advised you that I wanted to sell the factoring business of the company to a party or parties with whom you felt you could continue to work on a mutually satisfactory basis. During the course of our conversations respecting *192 these matters, I advised you that I would give you a reasonable opportunity to arrange for the sale of the factoring portion of the company to a party or parties of your selection, prior to my offering the business to any other party. You have advised that you immediately began negotiations leading to the sale of the factoring business of the company and that you believe that you can arrange for the sale on terms satisfactory to me in the very near future. Accordingly, I hereby give you the first option to purchase the factoring business of Lane Wood and Company for a period of two weeks from the date of this letter on terms satisfactory to me and to a party or parties whose financial condition is satisfactory. During the two-week period of this option, I agree not to negotiate for the sale or other disposition of the factoring business of Lane Wood and Company, and if you are successful in arranging for the sale of the factoring business to parties and on terms satisfactory to me, you may assign this option to such parties, and I agree to cause Lane Wood and Company to enter into a contract for purchase and sale with such parties. Of course, it is understood between us that you *193 are to receive no commission whatsoever in connection with any such sale of the factoring business of Lane Wood and Company. This letter was signed by Sammons. At the time this letter was signed all of the details of the sale of the factoring business of Old Lane Wood to Viking Corporation had been worked out. There was also drafted a letter dated April 14, 1962, addressed to Viking Corporation, signed by Washburne and noted accepted by Viking Corporation on April 14, 1962, by Charles Aberg, which read as follows: This letter is to set forth the agreement between us concerning our pooling of interests in acquiring the factoring assets of Lane Wood & Company of Dallas, Texas, it being understood that in such 583 acquisition, I will contribute my exclusive, irrevocable option to purchase same and you will contribute the necessary funds. I have previously delivered to you a copy of a letter dated March 28, 1962 addressed to me by Mr. C. A. Sammons, the beneficial owner of all of the stock of Lane Wood & Company, which grants to me an irrevocable first option for the purchase of the factoring business of Lane Wood & Company. Prior to and immediately after my receipt of this *194 option, I negotiated with you the basis on which these assets could be acquired from Mr. Sammons and together we have arrived at a satisfactory set of terms and conditions for their acquisition. In consideration of the assignment by this letter, to you of the option granted to me by Mr. Sammons, you will, upon your acquisition of said factoring assets, issue to me 10% of the Common Stock of Viking Corporation to be outstanding immediately after such acquisition, plus such other securities (the nature of which may be determined by you) as may be required so that the value of all such Common Stock and securities of Viking Corporation so delivered to me will be at least $100,000.00 on the date of delivery. We agree that it is our intention that my contribution of my option will be concurrent with the contribution by your prospective stockholders of the necessary cash for your purchase of the factoring business of Lane Wood & Company so that the transaction will qualify as a taxfree transaction pursuant to Section 351 of the Internal Revenue Code of 1954. By an amendment to the articles of incorporation of Viking Corporation, its name was changed to Lane Wood *195 & Company (hereinafter referred to as New Lane Wood), effective as of April 30, 1962. Also effective as of that date, the name of Old Lane Wood was changed to Rancho de Abequiu, Inc. On April 30, 1962, New Lane Wood issued 150,000 shares of $1 par value common stock, and 7,000 shares of $100 par 5 percent preferred stock; 6,150 shares of preferred stock and 135,000 shares of common stock were issued to Lynch, Aberg & Co. for a consideration of $750,000 paid in cash; and 15,000 shares of common stock and 850 shares of preferred stock were issued to Washburne. On April 30, 1962, the stock certificates representing the stock issued to Washburne were canceled and new certificates were issued on that same day as follows: Shares of
Shares of
Common
Preferred
Name
Stock
Stock
Elihu B. Washburne
13,500
766
Fred Kiesow, III
750
42
Joe T. Starkey
750
42
The purchase agreement between Old Lane Wood and New Lane Wood was executed on March 29, 1962. It set forth details of the agreement and provided for a closing of the transaction at 10:00 a.m. on April 30, 1962. It provided for assumption by the purchaser of all of the seller's obligations and liabilities *196 attributable to the factoring business and attached to the agreement was exhibit "A" containing a list of receivables which the seller had purchased from factored companies, client reserve debits, commercial notes receivable, and client reserves withheld, as well as the fixed assets which were being sold less allowance for depreciation. This purchase agreement which consisted of 29 typewritten pages contained a covenant by the seller not to compete with the purchaser for a 5-year period which was assigned a value of $125,000 of the total purchase price. It provided that the remaining portion of the purchase price would be the book value of the assets at the date of closing and the seller gave no guarantee of the collection of the accounts receivable and the notes which were the major portion of the assets transferred but merely that these assets were owned by the seller. The memorandum of the closing on April 30, 1962, recited that the consideration to be paid to Old Lane Wood for its factoring assets and business should be an initial cash payment in the amount of $4,600,000 plus the assumption by the purchaser of certain of the seller's obligations and that following the closing, *197 there would be a purchase price adjustment on the basis of an audit by a national accounting firm. Washburne and New Lane Wood entered into an employment contract dated May 2, 1962, whereby Washburne agreed to serve as president of New Lane Wood for a period of 5 years at an annual salary of $25,000 with a provision that the salary might be increased or augmented from time to time at the discretion of the employer's board of directors. The contract contained a provision that after termination of his employment, the employee would not compete in the factoring business for a 2-year period within a radius of 300 miles from any place of business of the employer at the time of such termination of employment. It also contained a provision that upon breach of the contract by the 584 employee, the employee would pay to the employer as liquidated damages the sum of $25,000 a year for each year or part thereof remaining in the term of the contract and provided that if the employer should materially breach the provisions of the contract it should pay the employee as liquidated damages the sum of $25,000 for each year or part thereof remaining of the term of the contract. Washburne was to *198 serve as president of New Lane Wood, Lynch was to serve as chairman of the board, and Aberg was to serve as secretary. Shortly after New Lane Wood began operating the factoring business Lynch did become employed by the corporation at a salary of $15,000 a year and Aberg at a $10,000-per-year salary. Neither Lynch nor Aberg had any prior experience in the factoring business. The acquisition of the factoring business by New Lane Wood on April 30, 1962, was financed by that corporation through the cash paid in for stock by Lynch, Aberg & Co. through bank loans and the issuance of long-term debentures. Lynch and Aberg obtained bank loans in the amount of $2,750,000 and long-term debentures from Connecticut General Life Insurance Company in the amount of $1,750,000. The $750,000 paid by Lynch, Aberg & Co. for the stock of New Lane Wood consisted of funds which had been contributed to that partnership by the general partners Lynch and Aberg and a number of limited partners. The receipt of the funds by New Lane Wood from the cash paid for stock and the various loans and the payment of the purchase price to Old Lane Wood were consummated on April 30, 1962 at one meeting of all interested *199 parties. Lynch and Aberg considered Washburne's primary importance to New Lane Wood to be as an employee. Because of his association with the factoring business of Old Lane Wood from its inception, they considered his relationship with clients, his reputation in the business, and his ability to manage the factoring business to be of major importance in the operation of New Lane Wood of the factoring business of Old Lane Wood which was being purchased. Rose and Sammons, in 1961 when they discussed with Washburne his finding of a purchaser for the factoring business of Old Lane Wood, expected to allow him a reasonable time to find such a purchaser. Rose did not want to liquidate the factoring business of Old Lane Wood because of the loss which might result from discounting accounts receivable for an immediate disposition thereof or in the collection of such accounts in the process of liquidation. In the view of Rose and Sammons, Washburne was in a better position to make a sale of the factoring business of Old Lane Wood than a business broker would be, and Rose and Sammons were for this reason as well as their personal friendship for him willing to allow him time to find a purchaser *200 so long as he was making an effort to sell the business. In their opinion, because of his association with the business Washburne was "the best one to sell the company." The preferred stock issued by New Lane Wood was $100 par value 5 percent noncumulative, nonvoting stock. There was no intent on the part of Lynch and Aberg to ever pay dividends on the preferred stock and they so informed Washburne. No such dividends have in fact ever been paid. Washburne, Starkey and Kiesow entered into a special agreement with Lynch, Aberg & Co. to exchange their preferred stock of New Lane Wood for common stock of New Lane Wood in the event Lynch, Aberg & Co. desired to make such an exchange of their stock. There was no provision for the exchange of preferred stock for common stock in the articles of incorporation of New Lane Wood and the purpose of the special agreement was to allow flexibility to Lynch, Aberg & Co. to make changes in the capitalization of New Lane Wood and if such changes were made to have Washburne, Starkey and Kiesow bound to the same changes with respect to their preferred stock in New Lane Wood. At the time the stock of New Lane Wood was issued on April 30, 1962, there *201 was no intention on the part of the directors of that corporation to declare any cash dividends on the common stock in the foreseeable future. No dividends in fact have been paid on the common stock. The stock certificates issued to Washburne, Starkey, and Kiesow contained the following notation: "Transfer of the shares represented by this Certificate have been restricted by an Agreement filed with the Company." The agreement referred to on the stock certificates issued to Washburne, Starkey and Kiesow was that the stock was being 585 acquired as an investment and not for resale. There was no agreement on the part of New Lane Wood to repurchase the stock of Washburne, Starkey, and Kiesow in the event of the termination of their employment or their death, although Washburne did have an understanding that if he disposed of his stock, he would afford New Lane Wood a first refusal of the stock at the price he could obtain elsewhere. The loan agreement between New Lane Wood and the First National Bank in Dallas provided in part that until the agreement was terminated New Lane Wood "covenants and agrees that it will not at any time, without the prior written consent of Bank:" *202 (a) Purchase or acquire, directly or indirectly, any stock or securities of any other person, firm or corporation; * * * (j) Declare or pay cash dividends, or make any other distribution with respect to any class of Company's stock now or hereafter outstanding, or purchase, call or redeem any of such stock or any debentures of Company outstanding; The loan agreement between New Lane Wood and Connecticut General Life Insurance Company carried restrictions on New Lane Wood's acquiring stock from its stockholders. The balance sheet for New Lane Wood immediately after its purchase of the factoring business of Old Lane Wood on April 30, 1962, showed the following: *13 ASSETS:
Current assets:
Cash
$ 885,794
Accounts and notes receivable:
Receivables purchased from factored companies
$3,857,231
Commercial notes receivable
684,506
Equipment leases receivable
85,228
Advances to factored companies
112,811
Other receivables
44,328
Accrued interest receivable 4,894
Total accounts and notes receivable
$4,788,998
Deduct, Balances payable on maturity of factored receivables 195,138
$4,593,860
Less, Reserve for losses 185,320
Net, accounts and notes receivable
4,408,540
Prepaid expenses 28,680
Total current assets
$5,323,014
Furniture and equipment at cost
30,298
Intangible assets and deferred charges Contracts and other intangibles
$100,000
Covenant not to compete
125,000
Organization expense (estimated) 40,000
265,000 *13
$5,618,312
LIABILITIES:
Current liabilities:
Notes payable, banks
$2,750,000
Accounts payable and accruals
59,910
Basic purchase price adjustment 202,312
Total current liabilities
$3,012,222
Long-term debt
5 3/4% Senior note, due 4-30-1968/72
$1,000,000
6 3/4% Subordinated note, due 4-30-1965/72 750,000
Total long-term debt
1,750,000 *13Lease rentals received in advance
6,090
CAPITAL:
Capital stock
5% Preferred stock, par value $100 per share, authorized, issued and outstanding 7,000 shares
$700,000
Common stock, par value $1per share, authorized 1,000,000 shares, issued and outstanding 150,000 shares 150,000
Total capital 850,000
$5,618,312
*203 586 The asset designation, "Contracts and Other Intangibles - $100,000.00" on this balance sheet represented the stock issued to Washburne, Starkey, and Kiesow. The assets actually transferred from Old Lane Wood to New Lane Wood on April 30, 1962, were transferred by an assignment whereby the assignor, Old Lane Wood, warranted that all factored accounts assigned to New Lane Wood had been duly assigned to Old Lane Wood by its respective clients only to the extent of such assigning client's right and that the assignor had no knowledge that any factored account was not a genuine account owed by the company to the client in the gross book value thereof. The assignor warranted that all receivables other than the factored accounts were genuine and valid and with the exception of a promissory note dated January 26, 1961 and due November 1, 1961 in the principal amount of $140,000 that the collection of no portion of these receivables was barred by the Statute of Limitations, the right of set off or any other rule of law relating to the validity of such receivables. The assignment specifically provided that the assignor did not warrant the collectibility of the receivables. The assets *204 actually transferred from Old Lane Wood to New Lane Wood on April 30, 1962, consisted of factored accounts receivable of $4,185,981, client reserve debits of $68,306, notes receivable of $742,010, various items of office equipment, furniture, and fixtures which were shown on the books of Old Lane Wood at a net value after reduction by depreciation of $30,298, and prepaid expenses which were shown on the books of Old Lane Wood at a net value of $28,680. The item designated as "client reserve debits" represented chargebacks to customers on factored accounts in excess of the reserve maintaind by Old Lane Wood. When Old Lane Wood factored an account which in substance amounted to purchasing the account from the person who had sold the goods generating the account receivable, in addition to the discount which it made for the services it rendered, it would withhold 10 percent of the amount as a reserve until the account receivable had been paid by the customer. Although Old Lane Wood guaranteed collectibility of an account when the account was factored or purchased from its client, the client was responsible for any nonpayment on the account because of adjustments such as returns or allowances *205 with respect to the goods sold and because of the possibility of nonpayment of an amount for such reasons the 10 percent was withheld until the account was paid by the customer to Old Lane Wood. When the account was paid in full, the amount would be paid over to the client of Old Lane Wood. In some instances returns and allowances amounted to more than 10 percent of the account receivable which was factored by Old Lane Wood and under Old Lane Wood's agreement with its clients, the client was responsible for paying this difference to Old Lane Wood. The client reserve debits represented amounts owed to Old Lane Wood by customers because amounts in excess of the 10 percent reserve withheld had not been paid on accounts receivable because of returns or allowances or something improper with respect to the goods sold. The notes receivable represented unsecured demand loans which had been made by Old Lane Wood to its factoring clients. Old Lane Wood generally had made the loans to these factoring clients because such clients could not obtain loans from banks or other financial institutions and Old Lane Wood would make the loan in order to develop its factoring business. The rate of *206 interest on bank loans obtained by New Lane Wood was 1 percent above the prime rate which was 4 1/2 percent in 1962 and New Lane Wood had to maintain with the bank at all times in free deposits 15 percent of the amounts of its line of credit as compensating balances. The rate of interest on the $1 million of senior debentures representing the loan from Connecticut General Life Insurance Company to New Lane Wood was 5 3/4 percent and the rate of interest on the $750,000 subordinated notes evidencing the loan from Connecticut General Life Insurance Company to New Lane Wood was 6 3/4 percent. Most of the organizational expenses of New Lane Wood of $40,000 had been incurred in obtaining bank loans and longterm financing for the company. New Lane Wood anticipated amortizing those expenses over a 5-year period. For its last full year of operations, the factoring business of Old Lane Wood had a gross income of $600,000 and a net profit 587 of $119,000. For the first full year of operation of New Lane Wood, its factoring business showed total gross income of $955,000 and it sustained an operating loss of $32,550. For the second year of its operations, New Lane Wood's gross income was *207 $1,270,000 and it had a net profit of $35,000. As of April 30, 1962, neither the preferred nor common stock of New Lane Wood had been publicly traded and the stock was not registered with the Securities and Exchange Commission. As the business of New Lane Wood developed, it became apparent to Lynch, Aberg and Washburne that Kiesow was not satisfactorily handling the work of treasurer of the company. His work for Old Lane Wood had been purely accounting work. In May 1963 it was determined that Kiesow's employment with New Lane Wood should be terminated. Lynch and Aberg originally considered offering Kiesow $1,000 for his stock in New Lane Wood, but Washburne talked with Lynch and Aberg and persuaded them that it would be better for the goodwill of New Lane Wood with its employees if Lynch, Aberg & Co. paid to Kiesow approximately the par value of his stock or $4,500. Washburne represented to Lynch and Aberg that they should view this payment as in the nature of a termination payment to Kiesow because of the length of service Kiesow had with Old Lane Wood and the fact that he had been with New Lane Wood since it commenced business. In November 1963 New Lane Wood acquired all of the *208 assets of Merchants Acceptance Corporation which was a company in Dallas engaged in the factoring of accounts receivable. This acquisition accounted for approximately 30 percent of the total business done by New Lane Wood in the year 1963. As of April 30, 1964, New Lane Wood became a wholly owned subsidiary of King Oil Company. The stockholders of New Lane Wood received in exchange for all of the outstanding stock of New Lane Wood 40 percent of the total outstanding stock of King Oil Company. King Oil Company was engaged in the oil and gas exploration business. When Lynch and Aberg were negotiating with King Oil Company with respect to that company's acquiring all of the stock of New Lane Wood, they discussed with Washburne the fact that he had more than 9 percent of the shares of preferred stock in New Lane Wood. Lynch and Aberg were interested in having Washburne own exactly 9 percent of the stock of New Lane Wood at the time of the exchange of the stock of that company for the stock of King Oil Company which required that his holdings of preferred stock be reduced by 158 shares. In order to reduce Washburne's holding to exactly 9 percent, New Lane Wood retired 158 shares of *209 his preferred stock at par value of $100 a share. Aberg represented the stockholders of New Lane Wood during negotiations with representatives of King Oil Company. Aberg had drawn up papers providing for 9 percent of the stock of King Oil which was to be received by New Lane Wood for its stock to go to Washburne. He gave Washburne these papers to look over and Washburne pointed out to him that he held in excess of 9 percent of the preferred stock of New Lane Wood. Aberg told Washburne that he should be willing to turn in all of his New Lane Wood stock in return for 9 percent of the stock of King Oil Company to be received by New Lane Wood. A difference of opinion arose between Aberg and Washburne. Washburne refused to turn over his stock in exchange for stock of King Oil Company without some adjustment for his holding of preferred stock in excess of 9 percent of the total preferred stock of New Lane Wood. Aberg had agreed to deliver to King Oil Company 100 percent of the New Lane Wood stock. Lynch and Aberg therefore had to make some provision for compensation to Washburne for his preferred stock of New Lane Wood in excess of 9 percent. In settlement of the difference of opinion between *210 Washburne and Aberg, it was finally agreed that New Lane Wood would retire the 158 shares of Washburne's stock at par value. After the acquisition of the stock of New Lane Wood by King Oil Company, the name of that company was changed to Lane Wood, Inc. Since April 30, 1964, the stock of Lane Wood, Inc., has been traded in the national over-the-counter market. Since April 30, 1964, Lane Wood, Inc., has acquired several other businesses. In 1967 the common stock of Lane Wood, Inc., sold for $7 to $8 a share or a price-earnings ratio of 8 to 1 based on its current year's earnings and 10 to 1 based on its prior year's earnings. Walter Heller Company and James Talcott Company each is engaged and each 588 was as of April 30, 1962 engaged in the factoring business. Their operations are not limited to the factoring business but also include other phases of commercial finance through subsidiary companies. The general securities market at April 30, 1962, was in a down-trend. The Dow Jones averages were in a steady down-trend from sometime in December 1961 until after April 30, 1962. Capital of the Southwest is a small business investment company with its headquarters in Dallas, *211 Texas. In April 1962 this company was engaged in the business of borrowing funds from bankers and other financial institutions and lending money to small businesses. The stock of Capital of the Southwest was publicly traded and in April 1962 this stock was selling at a discount of 25 percent below its underlying net asset value. No one of petitioners reported for Federal income tax purposes any income with respect to receipt on April 30, 1962, of stock of New Lane Wood. Respondent in his notice of deficiency to each Elihu B. Washburne and Mary W. Washburne increased reported income by $50,000 with the following explanation: It is determined that Elihu B. Washburne and Mary W. Washburne realized community income in the amount of $100,000.00 from his receipt of 15,000 common shares and 850 preferred shares of the corporate stock of Lane Wood & Company (Formerly Viking Corporation) as compensation for services. Your 50 percent of that unreported community income is $50,000.00. Respondent in his notice of deficiency to Joe T. Starkey and Frances H. Starkey increased income as reported by $4,950 with the following explanation: It is determined that you realized this amount of *212 unreported income from your receipt of 750 common shares and 42 preferred shares of the corporate stock of Lane Wood & Company (Formerly Viking Corporation) as compensation for services. Respondent in his notice of deficiency to Fred Kiesow III and Jo Ann Kiesow increased income as reported by $4,950 with the same explanation as that given to Joe T. Starkey and Frances H. Starkey. Ultimate Facts 1. Washburne's oral agreement with Sammons in 1961 was an agreement that Sammons would allow Washburne a reasonable time in which to effect a sale of the factoring business of Old Lane Wood for Sammons. Considering the circumstances surrounding the letter from Sammons to Washburne dated March 28, 1962, this letter did not in substance constitute an option to Washburne to purchase the factoring business of Old Lane Wood. 2. The fair market value on April 30, 1962, of the stock of New Lane Wood issued on that date to Washburne was not in excess of $20,000 and the fair market value on April 30, 1962, of the stock of New Lane Wood issued on that date to Starkey and Kiesow was not in excess of a total of $2,000 or $1,000 for the stock issued to each of them. Opinion Petitioners contend *213 that Washburne, Starkey and Kiesow received their stock in New Lane Wood in exchange for property and therefore no gain or loss should be recognized on the transaction in accordance with the provisions of section 351, I.R.C. 1954. [2] Petitioners state that the property which Washburne, Starkey, and Kiesow exchanged for stock in New Lane Wood was an option to purchase the factoring business of Old Lane Wood, that this option was assigned by them to New Lane Wood, and that in consideration of the assignment or transfer of this option to New Lane Wood, stock was issued to them. Petitioners state that an option in the hands of the holder of the option constitutes property, citing Commissioner v. Smith, 324 U.S. 177 (1945), William H. Bateman, 40 T.C. 415 (1963), H. B. Zachry Co., 49 T.C. 73 (1967), on appeal (C.A.5, April 1, 1968), and certain memorandum opinions of this Court dealing with the assignment to a corporation of an option to purchase real estate. Petitioners argue that the facts in this case show that Washburne had *214 an option to purchase the factoring business of Old Lane Wood and that he "transferred" the "property" represented by such option to New Lane Wood in exchange for stock of that company. 589 We need not decide whether under any factual circumstances an oral agreement by a stockholder of a corporation to allow an employee of the corporation to purchase the business might constitute "property" within the meaning of section 351, since from a consideration of all the evidence in this case, we have concluded that no such oral agreement existed between Sammons and Washburne. Sammons, as in substance the owner of all the stock of Old Lane Wood, and Rose, as his representative in dealing with Washburne, agreed to permit Washburne a reasonable time within which to sell the factoring business of Old Lane Wood or the stock of that company after assets other than those of the factoring business had been removed from the corporation on the basis of an amount of at least $125,000 in excess of the book value of the assets of the factoring business of Old Lane Wood with the other terms and conditions of the sale to be worked out to the satisfaction of Sammons as the owner of the stock of Old *215 Lane Wood. Any individual who is acting as agent for another in attempting to make a sale of some asset could, if financially able, probably buy the asset which he is attempting to sell. However, this does not mean that the individual had an option to purchase the asset. An option to purchase necessarily requires an understanding between the "optionor" and "optionee" not only with respect to price but with respect to other terms and conditions of the sale such as whether payment must be by cash, the exact nature of the assets to be transferred, and the terms of the transfer. Petitioners in their brief argue that all the witnesses in this case testified that Sammons had granted to Washburne an option to purchase the factoring business of Old Lane Wood. However, an examination of the testimony of the various witnesses does not support this contention. Sammons testified that he thought that if Washburne "could get as much as we wanted in a company that might wish to retain his services that we would be in favor of having that accomplished, and I think this is substantially confirmed by the *216 copy I am looking at of my letter of March 28, 1962, in which we granted him an option to make a sale if he could at a price satisfactory to us." Sammons' memory was so vague with respect to the transation that his testimony is of little value in reaching our conclusion in this case. Rose who had more detailed conversations with Washburne and who represented Sammons in transactions with Washburne answered, "yes," to the question of whether he told Washburne that he would have the first right or option to buy the business at book value plus $125,000. However, in further explaining this, he stated that he wanted it understood that he never made a deal with the representatives of Allied Finance but that he backed off at Washburne's request, and then said to Washburne, "All right you find us somebody * * * You find somebody that we can make a deal with." He further stated in explaining the arrangement, "We did not turn it over to business brokers. We did not contact anyone ourselves. Hugh [sic] [Washburne] was our agent at the time." Rose further stated with respect to the time which he and Sammons allowed Washburne in which to perfect a sale, "We said a reasonable time. As long as *217 he was making an effort, then that was fine, because we thought it would be better for him, and we further thought that he would probably be the best one to sell the company." In explaining the fact that Washburne remained employed by Old Lane Wood until the sale to New Lane Wood was completed, Rose stated: "That is one of the hazards obviously where you have a man that is going to go to a new company and he is also selling your company. I think the word is conflicting interests. We had no worries about Hugh [sic] Washburne doing that, because we knew of his integrity." Lynch, throughout his testimony, referred to Washburne's representing to him that he had "an option from Mr. Sammons to sell the business." After several such references, petitioners' counsel called Lynch's attention to the fact that he had used the words, "option to sell" and asked whether that was what he meant. Lynch replied: * * * he told me that - when we first discussed it, that he was not able to exercise that option himself. Now, I am not sure - Q. You mean a option to acquire the factoring business? A. That's correct. However, on cross-examination Lynch explained in answer to the question of whether *218 it was his understanding that in essence Washburne was selling the business as follows: I will answer it this way. Mr. Washburne was very explicit with me in saying that he was not able to acquire 590 the business, that he did not have the resources to acquire it, so in that context I guess the answer to your question is yes. Aberg did testify with respect to his discussions with Washburne that "We understood that he had the option to buy the business to which he couldn't exercise." However, Washburne, himself, described his understanding with Sammons by referring to "an option with the company." He testified with respect to talking with Sammons after he had attended the conference with representatives of Allied Finance and Rose and said his recollection was that Sammons said, "Well, actually, Hugh, we wouldn't sell the company to someone you didn't want. But we do want to sell the company. What is your suggestion? And we do want to sell it for this book value plus $125,000." Washburne replied to Sammons, "Well, my suggestion is that you give me a 60-day option with the company. Now, understand I want a little bit open end, because if I negotiate with somebody on 59 days *219 and it looks like a good buy, I don't want the door closed on me. I would like a 60-day option on the company at a set price, and I believe I could find a buyer." Sammons told Washburne that was all right. From these various descriptions of the loose oral understanding between Sammons and Washburne with respect to Washburne's finding a buyer for the factoring business of Old Lane Wood, we conclude that the agreement between Sammons and Washburne in late 1961 was that Sammons would not attempt himself or through a broker to find a buyer for the factoring business or stock of Old Lane Woods for a reasonable period of time so that Washburne might have time to find a buyer for the business with whom he could make arrangements which he deemed satisfactory and that if Washburne procured a buyer who would pay at least $125,000 over the book value of the assets of Old Lane Wood and would purchase the company on conditions otherwise satisfactory to Sammons that Sammons would favorably consider selling the business to such person. In our view Sammons reserved completely to himself approval of any proposed purchaser that Washburne might find for the business and the precise terms on which *220 the business would be sold. The price given to Washburne of at least $125,000 over the book value of the company was merely as a guideline to Washburne to assist him in his efforts to find a buyer and not a fixed price for the sale such as would be present in an option to an individual to buy. That this was the understanding between Sammons and Washburne is further borne out by the fact that when Washburne did take representatives of Walter Heller Company to Rose and Sammons no sale of the business was made and a sale to New Lane Wood was made only after some extended negotiations. Apparently there had been no precise understanding between Sammons and Washburne to what extent Old Lane Wood was willing to guarantee either the factoring accounts or loan accounts which were to be transferred in the sale of the factoring business of Old Lane Wood. Representatives of Walter Heller Company were unable to work out a satisfactory agreement in this regard with Sammons and Rose. Also, the evidence discloses that Lynch and Aberg had a number of contacts with Rose and Sammons with respect to the purchase of the factoring business of Old Lane Wood and that even after they expressed a definite *221 interest in purchasing the business it was subject to working out detailed agreements. Until such time as the detail which was ultimately contained in a 29-page written contract, which was executed on March 29, 1962, was worked out between Sammons and Aberg and Lynch, there was no firm or binding agreement for the sale or the purchase of the factoring business of Old Lane Wood. Had Washburne had an option to purchase Old Lane Wood of such a nature as to represent a contractual property right to purchase, the details, at least to an appreciable extent, would have been understood when the option was granted. We do not consider that the letter of March 28, 1962, granted any option to Washburne to purchase the factoring business of Old Lane Wood. This letter was written when for all practicable purposes the sale had been consummated. It was prepared by an attorney at Washburne's request after Washburne had agreed with Lynch and Aberg as to the stock he would receive in New Lane Wood and was trying to arrange to receive the stock in a tax-free transaction. The letter stated that Sammons had advised Washburne that he would give him "a reasonable opportunity to arrange for the sade of the *222 factoring portion of the company to a party or parties of your 591 selection, prior to my offering the business to any other party. * * *" The letter then referred to Washburne's being given "the first option to purchase the factoring business * * * for a period of two weeks from the date of this letter on terms satisfactory to me and to a party or parties whose financial condition is satisfactory." The indication, even from the letter of March 28, 1962, is that Washburne had merely the right to attempt to make a sale of the factoring business of Old Lane Wood. If the letter of March 28, 1962, could be viewed as constituting "property" which might be transferred to a corporation within the meaning of section 351, there would still be no transfer of property within the meaning of section 351 here present since at the time this letter was written New Lane Wood had agreed to purchase the factoring business of Old Lane Wood under conditions which were contained in the written contract entered into between representatives of Old Lane Wood and Lynch and Aberg as representatives of New Lane Wood on March 29, 1962, the day after the date shown on the letter. Having concluded that the *223 stock was not issued to Washburne for property transferred to New Lane Wood, it is unnecessary to determine precisely the reason the stock was issued to him. However, from the record as a whole, we conclude that the stock was issued to Washburne primarily for two reasons - one being as compensation for bringing to the attention of Lynch and Aberg the availability of a business which they could purchase and the other Washburne's agreement with Lynch and Aberg to continue to manage the factoring business when it was acquired by New Lane Wood. Both of the reasons which we conclude constitute the consideration for the issuance of stock of New Lane Wood to Washburne represent services rendered or to be rendered by Washburne for New Lane Wood. The parties recognize that stock was issued to Starkey and Kiesow for the same reasons that it was issued to Washburne, and therefore we will not further discuss the facts with respect to them except to say they, of course, too, agreed to remain as employees of the factoring business when it was taken over by New Lane Wood. If the stock is viewed as being issued to Washburne, Starkey and Kiesow because of their bringing the availability of the *224 factoring business of Old Lane Wood to the attention of New Lane Wood, the stock was issued to them as compensation for services. United States v. Frazell, 335 F. 2d 487 (C.A. 5, 1964). If the stock was issued to Washburne, Starkey and Kiesow because of their agreement to become employees of New Lane Wood, it represents stock issued to them for future services and therefore to the extent of the fair market value of the stock received by them constitutes ordinary income to them. See section 1.351-1(a) (1) (i), Income Tax Regs.
Having concluded that the stock received by Washburne, Starkey, and Kiesow represented income to them to the extent of its fair market value as of April 30, 1962, it is necessary to determine the fair market value of such stock on April 30, 1962. Respondent in his notice of deficiency considered the fair market value of the stock to be its par value. [3] On brief respondent does not argue that the par value of the stock represents its fair market value as of April 30, 1962, but rather contends that the fair market value of the stock can be best measured by considering that the stock issued to Lynch, Aberg & Co. had *225 a fair market value of the $750,000 cash which that partnership put into the company and that the stock issued to Washburne, Starkey and Kiesow had the same per share fair market value as the stock issued to Lynch, Aberg & Co. Since Lynch, Aberg & Co. received 90 percent of the stock for cash of $750,000, respondent concludes that 10 percent of the stock should be worth $83,333, and therefore the fair market value of the stock received by Washburne on April 30, 1962, was $75,000 and the fair market value of the stock received by each Starkey and Kiesow was $4,166.50 Respondent's position as to the fair market value of the stock overlooks many factors which affect the price of a willing buyer will pay a willing seller for stock where both are reasonably informed *226 and under no compulsion to buy or to sell. The fair market value of the stock received by Lynch, Aberg & Co. is not necessarily equal to the cash paid into the company by $&592 that partnership. The cash was used as part of the funds to acquire the factoring business and therefore when the stock was issued it would be necessary to look to net asset value of the business acquired as well as the cash paid in as a factor in determining the value of the stock issued for the cash. The transactions of the paying in of cash for stock, acquiring the factoring business, and issuing of stock to Washburne, Starkey and Kiesow were all handled at the same meeting. There is evidence in the record dealing with the net asset value of New Lane Wood on April 30, 1962. In valuing the stock received by Lynch, Aberg & Co. which had the controlling interest in New Lane Wood, more weight might be placed on the net asset value than should be given to this factor in valuing the stock of petitioners. It would certainly be more difficult to dispose of a 9 or 1 percent interest in a new enterprise such as New Lane Wood than to dispose of a majority interest. This lack of marketability has a depressing effect *227 on the fair market value of the stock. We have set forth certain facts in our findings and we have considered all of the facts of record in reaching our evaluation of the stock issued to Washburne, Starkey and Kiesow. We have considered the computations presented by petitioners' expert witnesses and the opinions of these witnesses. We have also considered the fact that Washburne was to be the manager and chief executive officer of New Lane Wood and that the success of the business would to a substantial extent be dependent on his management. However, we have considered that Washburne or a comparably qualified manager should be considered as the manager of the business in valuing the stock. We have also considered the agreements which Washburne, Starkey, and Kiesow had with respect to the sale of their stock, the earnings of Old Lane Wood and the expenses which New Lane Wood would have which were not present in the operation under Old Lane Wood. We have considered the net asset value of the company as best we were able to determine that value from the evidence adduced, as well as the book value of the company. We have not accepted petitioner's contention that certain of the notes *228 acquired from Old Lane Wood were worthless since the evidence shows that these notes were in fact collected. We have, however, recognized that only by holding these notes over a period of time could they be collected in full. We have also considered the fact that Kiesow was paid, even though not in a true arm's-length transaction, close to the par value of his stock when he left the employ of New Lane Wood. We have also noted that in 1964 when New Lane Wood's stock was being exchanged for stock of King Oil Company, Washburne was able to bring sufficient pressure on the holders of the majority of the stock of New Lane Wood to cause them to have the corporation redeem 158 shares of his preferred stock at its par value. We recognize however the effect of the date and the circumstances of this transaction on the weight to be given it in determining fair market value as of April 30, 1962. On the basis of all the evidence of record we have concluded that the fair market value of the stock received by Washburne on April 30, 1962, was as of that date $20,000 and that the fair market value of the stock received by each Starkey and Kiesow on April 30, 1962, was $1,000 as of that date. We, *229 therefore, conclude that there should be included in Washburne's income because of the receipt of stock of New Lane Wood on April 30, 1962, the amount of $10,000; that there should be included in Mary W. Washburne's income because of Washburne's receipt of stock of New Lane Wood on April 30, 1962, the amount of $10,000; that there should be included in the income of Joe T. Starkey and Frances H. Starkey Because of receipt of stock of New Lane Wood on April 30, 1962, the amount of $1,000; and that there should be included in the income of Fred Kiesow III and Jo Ann Kiesow because of receipt of stock of New Lane Wood on April 30, 1962, the amount of $1,000. Decisions will be entered under Rule 50. 593 Footnotes
1. Cases of the following petititioners are consolidated herewith: Mary W. Washburne, Docket No. 582-66; Joe T. Starkey and Frances H. Starkey, Docket No. 693-66; and Fred Kiesow III and Jo Ann Kiesow, Docket No. 694-66.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. Actually, respondent determined the fair market value of the stock to be more than its par value since the full amount was determined to have been received by Washburne and 5 percent of the amount received by Washburne was determined to have been received by Starkey and Kiesow. However, respondent represented at the trial and on brief that he did not contend that the stock had a fair market value in excess of par value.↩