Sidney J. Ungar and Helen Ungar et al. [1] v. Commissioner. Ungar v. Commissioner
Docket Nos. 92533, 92534, 92545, 1450-62, 1451-62.
United States Tax Court
T.C. Memo 1963-159; 1963 Tax Ct. Memo LEXIS 184; 22 T.C.M. (CCH) 766; T.C.M. (RIA) 63159; June 10, 1963
Martin M. Lore, for the petitioner. James Q. Smith, David J. Harris, and Murray Kirschner, for the respondent. Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Docket
Petitioner
No.
1957
1958
Sidney J. and
92534
$63,278.47
Helen Ungar
1450-62
$20,853.79
Garep Realty
Corp.
92533
46,543.31
Jarc Realty &
92545
24,230.99
Management
1451-62
2,194.07
Corp.
The Commissioner has stated in his brief that he will not press the "main issue presented in the statutory notices for Docket Nos. 92534, 92533 and 92545" "[in] *185 view of the proof offered at the trial that Garep Realty Corp. and Jarc Realty & Management Corp. were Sidney J. Ungar's nominees concerning the main transaction in issue." He concedes that there is no issue for decision in 92533 and because of mutual concessions, no issue for decision in 92545 and 1451-62 and decision in those cases may be entered under Rule 50. He further concedes that, because of the proof offered, the amount of additional income involved in the main issue to be decided in 92534 is $155,000. His concessions leave for decision only issues raised in the Ungar cases and those are (1) whether securities of Duane-Broad Corporation were received by Sidney in 1957 as compensation for personal services and, if so, what was their fair market value, (2) whether the gain from the sale of some of those securities in 1958 was short-term capital gain instead of capital gain as reported, and (3) whether a medical deduction is allowable for amounts paid by Sidney on account of the illness of his mother. The first issue was raised by the Commissioner in his answers and he has the burden of proof on that issue. Findings of Fact The petitioners, husband and wife, filed joint income *186 tax returns on on a cash basis for 1957 and 1958 with the director of internal revenue for the Upper Manhattan district. Sidney was engaged in the practice of law and also in real estate activities. Sidney learned in September 1957 that a property at 299 Broadway in New York City was for sale. It was owned by Broaduane Corporation which was owned by the estate of Elias Cohen. The Cohen executors advised Sidney that they desired to sell the property in order to pay estate taxes. He was also told that the City of New York was renting a large part of the 19-floor building on the property but the lease had expired and the City had a right to continue its occupancy until June 30, 1959, at a rental of $1.90 per square foot. The executors had tried, unsuccessfully, to negotiate a new 10-year lease with the City at $3 per square foot. Sidney told the executors that he would be interested in buying the property only if the City would continue as a lessee. He learned that the City desired to continue as a tenant after June 30, 1959, but would not agree to any increase in rent up to that date or to a 10-year lease, it wanted some improvements made, and it would consider an increase in rent *187 for the period after June 30, 1959, based upon improvements. The executors and Sidney agreed upon terms for the purchase of the property and Garep entered into a contract dated September 13, 1957, to purchase the property for $2,050,000 payable as follows: $ 25,000
upon signing the contract
35,000
upon execution of a renewal
lease with the City on or be-
fore October 31, 1957
540,000
upon the closing
1,172,530.13
by taking title subject to a first
mortgage held by Roosevelt
Savings Bank
277,469.87
by a purchase money second
mortgage
$2,050,000
Closing was to be on or before January 31, 1958. The seller agreed to negotiate further with the City for a new lease on stated terms. Sidney made the $25,000 payment. He had Garep assign the contract to Jare on September 18, 1957. Both were Sidney's nominees. A lease with the City for 6 years and 4 months was agreed upon in October 1957 after negotiations by the seller. The seller requested that the $35,000 payment under the contract be increased to $75,000 in view of the shortened lease period. Sidney agreed and paid the $75,000. The Roosevelt Savings Bank agreed on October 28, 1957, to *188 increase the existing mortgage to $1,400,000 and this obviated the necessity for a second mortgage. Sidney believed that this arrangement would permit sale of securities on the property to the public. Sidney caused Duane-Broad Corporation to be organized on November 1, 1957, with a capitalization of 1,000 no par value shares. Jarc then assigned the purchase agreement to Duane-Broad and the latter on November 14 and 15, 1957, issued 155 of its shares to Sidney, 5 to Abraham Shore, and 4 to Sol Mandell. It also issued on November 15, 1957, its bonds, $75,000 to Sidney, $41,250 to Jarc (as a capital contribution by Sidney to Jarc), $3,750 to Shore, and $3,000 to Mandell. The securities issued to Shore and Mandell were for their agreement to participate in the venture. The securities issued to Sidney were in exchange for his interest in the contract. Duane-Broad had no assets other than the contract at the time it issued the abovementioned securities and was not then under any obligation to issue any additional stock or securities. Sidney, on November 25, 1957, had Duane-Broad assign the contract to purchase the 299 Broadway property to S. J. Ungar Affiliates, Inc., a newly organized *189 corporation, which agreed to raise all funds necessary to purchase the property and to make the agreed improvements, mortgage the property, and convey it to Duane-Broad, whereupon the latter would issue additional stock and bonds making a total of 950 shares at a nominal value of $250 per share, or $237,500, and $712,500 in bonds, outstanding. This additional issuance of bonds and stock in the amount of $786,000 was to be sold to the public and $650,000 of the proceeds was to be used to pay the cash in that amount payable under the contract. The remaining $136,000 was paid as expenses of purchasing the property and selling the securities. A brochure pertaining to the property was prepared and sent to the public on or after November 25, 1957. The first public subscription came in on November 29, 1957. Sidney sold 57 1/2 Duane-Broad units (1 share, 1 bond) on March 25, 1958, for $57,500. He reported a long-term capital gain of $57,500 on the sale. The Commissioner, in determining the deficiency for 1958, held that the sale resulted in a short-term capital gain of $57,500. Sidney's mother, then about 90 years of age, suffered a brain hemorrhage early in 1958 while living with her *190 daughter, Blanche Grossman, in Atlantic City, New Jersey. Sidney had his mother brought to a New York hospital in an ambulance. She was seen upon arrival by his family physician and a specialist. His doctor advised that the patent would need nursing care for an extended period and she could receive better care at less expense in accommodations away from a hospital. Sidney rented a small two-room apartment in the building where he lived, equipped it, engaged full-time nursing aid and kept his mother there under the doctor's care and supervision for 7 months. The rent for the apartment for that period was $1,400. The patient then had recovered somewhat and requested that she be returned to Blanche in Atlantic City. There she continued to have and to require the services of a nurse and Blanche. Blanche was employed in her husband's shoe store and advised Sidney that she could give her time to their mother only if Sidney would pay the cost of a clerk to take Blanche's place in the store. Sidney, in order to secure Blanche's services for their mother during the remainder of her convalescence, paid a shoe store clerk $60 a week for 6 weeks. The Commissioner, in determining the deficiency *191 for 1958, allowed all medical expenses claimed by Sidney except $1,400, representing the rent of the apartment in New York and the $360 paid so that Blanche could assist with the care of her mother in her home in Atlantic City. The Commissioner erred in excluding the two items from the computation of the medical expense deduction. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The Commissioner now contends, contrary to his deficiency determination, that Sidney received the stock and bonds of Duane-Broad in 1957 for services and not for property in a transfer coming under section 351 of the Internal Revenue Code of 1954. He has the burden of proof. Sidney did not obtain the new lease although he made some inquiries about it. He may have helped to eliminate the second mortgage but that is not clear. However it appears by a fair preponderance of the evidence that Sidney did not receive the securities for services but, instead, received them for his interest in a valuable contract (property) which he had acquired to purchase the property at 299 Broadway under favorable terms. It also is shown clearly that when he *192 received those securities he was in control of Duane-Broad within the meaning of section 351 and it was under no compulsion to sell more of its stock. Also the Commissioner has failed to prove any fair market value for the stock at that time. The first issue is decided for the petitioners. The Commissioner's discussion in his brief of the issue relating to the sale of 57 1/2 units of Duane-Broad securities in 1958 indicates that under our decision of the first issue he would concede that Sidney's holding period for those securities began on September 13, 1957, and the tax on the gain would be taxable as long-term capital gain. It is so held. The only question raised with respect to the medical expense claimed on the 1958 return is whether the $1,400 paid by Sidney for two rooms in which he placed necessary hospital equipment for the care of his mother and $360 which he paid to secure the services of his sister are to be included in the computation of the deduction. The rooms were rented in order to avoid the higher costs of space in a hospital and to provide better care for the patient. Why this expense would be less of a medical expense than the payment to a hospital for a room *193 has not been set forth by the Commissioner. He argues that the rooms were more for the convenience of the patient's family than for the patient but the facts show that that was not true. This expense, or a larger one, was unavoidable under the circumstances shown and was a medical care expense within the meaning of section 213. It was unlike the expense of lodging during a period of convalescence and was quite similar to room rent in a hospital during an acute stage of illness. The $360 was paid so that the patient could have the aid of her daughter during the final stages of convalescence and thus avoid the larger expense of a second nurse. This, too, is a legitimate medical care expense which was necessary in order to avoid a larger, more direct expenditure for required nursing care. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners were consolidated herewith for trial: SIDNEY J. UNGAR and HELEN UNGAR, Docket No. 1450-62; GAREP REALTY CORP., Docket No. 92533; and JARC REALTY & MANAGEMENT CORP., Docket Nos. 92545 and 1451-62.↩