WADE AND CATHERINE D. VOLWILER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6379–69SC. Filed December 13, 1971.

*Robert Earl Smith*, for the petitioners.
*Vivian T. Martinez, Jr.*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $644.62 in the petitioners' 1966 Federal income tax. The issues for decision are whether the petitioners may deduct as a medical expense—(1) the amount which they contributed to enable their daughter to purchase an automobile, and (2) the amounts which they gave to their daughter and which she spent for lodging and for a telephone.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Wade and Catherine D. Volwiler, are husband and wife and maintained their legal residence in Seattle, Wash., at the time the petition was filed in this case. They filed their joint Federal income tax return for 1966 with the district director of internal revenue, Seattle, Wash.

While at college in the spring of 1964, the petitioners' daughter, Susan Volwiler, developed a severe and acute psychosis and was hospitalized. Her illness was extremely serious, and she was transferred to the hospital at the University of Washington for care by Dr. Holmes, a psychiatrist, who had treated her previously and who devoted a great deal of time to her treatment. She remained in the hospital until June of 1966.

About 6 months before the end of Susan's second year in the hospital, Dr. Holmes began making plans for her discharge. He wanted her to leave the hospital because he feared that she would become a permanent hospital patient if she remained there beyond the 2-year period. He did not want Susan to go home because her feelings toward the petitioners contributed to her illness, but he did not want her to be completely on her own. He, therefore, tried to locate a "halfway house" where Susan could live for the first 6 to 12 months after her discharge.

There were no halfway houses for psychiatric patients in Seattle, so Dr. Holmes set about "constructing" a halfway house. To get Susan and her mother working together, he told them to find a rooming house with a custodian near the university. They found such a facility, and Susan leased a room in her name. However, the arrangement proved unsatisfactory. The custodian was of little or no assistance to Susan, and there was an attempted break-in at the rooming house. It was then decided that Susan should move into an apartment in the area of the university. Susan and her mother chose the apartment, and Dr. Holmes inspected it. The lease was in Susan's name. In both the room in the boarding house and in the apartment, Susan had a private telephone installed. The telephone enabled Susan to speak to Dr. Holmes whenever she was disturbed, and she called him on a daily basis. Neither the apartment nor the boarding house was specially equipped or furnished, and neither was engaged regularly in providing any type of medical care.

While Susan lived in the boarding house and apartment, she worked as a dance instructor for mentally retarded children. The work was part of Susan's vocational rehabilitation.

To prevent Susan from being a "drain" on the family, to give her both a feeling of independence and a sense of responsibility, and to help her overcome her phobia concerning automobiles, Dr. Holmes suggested that the petitioners buy Susan an automobile. A 1964 Dodge Dart automobile, which was of standard design and not specially

equipped in any manner, was purchased in November of 1966 for $1,550, its fair market value at that time, and title was taken in Susan's name. The petitioners paid $1,200 of the purchase price directly to the car dealer, and Susan paid $350. During 1966, Susan paid all the operating expenses of the automobile. At the outset, the automobile was used primarily to visit Dr. Holmes, to commute to work, and to visit nurses whom Susan had met in the hospital. Dr. Holmes believed that Susan's visits to the nurses were a part of her overall resocialization therapy.

During 1966, Susan, who was 22 years old, had earnings of $1,038.87 from her employment as a dance instructor, and she received a $1,100 allowance from her parents. To give Susan experience in handling money, no restrictions were placed on how she should spend her allowance. Dr. Holmes believed that such experience was a needed part of Susan's overall rehabilitation program. Out of the allowance from her parents, Susan paid her living expenses, including the rent for the room in the boarding house and for the apartment and the charges for the telephone. Although her parents did not place any restrictions on the allowance, they did expect Susan to use it for paying her rent and telephone charges.

On their 1966 return, the petitioners deducted $1,200 which they contributed toward the purchase of the car, $525 of the allowance which they gave Susan for the rental of the room and the apartment, and $41.10 of such allowance for the cost of a private telephone. The respondent determined that these expenses did not constitute medical expenses and denied the deduction.

OPINION

First, we shall consider whether the amount which the petitioners contributed to purchase the automobile is deductible as a medical expense. The purchase of an automobile is generally considered to be a nondeductible capital expenditure. *D. H. Willey Lumber Co.* v. *Commissioner*, 177 F. 2d 200 (C.A. 6, 1949), affirming per curiam a Memorandum Opinion of this Court; see 4A Mertens, Law of Federal Income Taxation, sec. 25.20 (1966). However, the expenditures for medical care which are deductible under section 213 of the Internal Revenue Code of 1954 [1] may, under some circumstances, include capital expenditures. Section 1.213–1(e)(1)(iii), Income Tax Regs., states in part:

For purposes of section 213 * * * a capital expenditure made by the taxpayer may qualify as a medical expense, if it has as its primary purpose the medical care * * * of the taxpayer, his spouse, or his dependent. * * *

---

[1] All statutory references are to the Internal Revenue Code of 1954.

See *Wallace* v. *United States,* 439 F. 2d 757, 759 (C.A. 8, 1971). If the only use of the item is to provide medical care, the expenditure therefor is a medical expense under section 213. However, if the expenditure is for an item which serves some medical purpose but which also serves some nonmedical purposes, we must decide whether the primary purpose for the expenditure was to provide medical care, and to be entitled to deduct such expenditure, the petitioners have the burden of proving that it was primarily for medical care. See *Wallace* v. *United States, supra* at 759; *Oliver* v. *Commissioner,* 364 F. 2d 575, 577 (C.A. 8, 1966), affirming a Memorandum Opinion of this Court.

Dr. Holmes testified that Susan could be completely on her own within a 6- to 12-month period after her release from the hospital and, apparently, the therapeutic effect of driving, which was a part of her program of readjustment, would end at the conclusion of that period. The automobile was not purchased until Susan had been out of the hospital for 5 months, and therefore the therapeutic value of the automobile would last, at most, a period of 7 months. The petitioners have presented no evidence to indicate that the automobile was useful only for that period of time; rather, we are confident that a 1964 automobile, which had a fair market value of $1,550 when it was purchased in 1966, had a useful life substantially longer than 7 months. Thus, even if the automobile were considered to be used for medical purposes during the period of Susan's readjustment, only a small portion of its purchase price could properly be allocated to that period, and therefore, the automobile could not be considered as having been purchased primarily for medical care.

Moreover, the petitioners have failed to show that the automobile was used primarily for medical purposes during the period of Susan's readjustment to society. The mere fact that a doctor recommended an expense does not make it a deductible medical expense. *Edward A. Havey,* 12 T.C. 409, 412 (1949). Driving may have been helpful to Susan in overcoming her phobia; yet, there is no showing that Susan could not have secured the needed driving experience using her mother's automobile. The automobile may have been used for the visits to Dr. Holmes, but it was also used for other purposes. Dr. Holmes stated that it was purchased because Susan had so many places to go that she was becoming a "drain" on the petitioners and because owning her own automobile would give Susan both a feeling of independence and a sense of responsibility. Neither of these reasons is medical in nature. One concerns the convenience of the petitioners, while the other cannot be distinguished from the normal need of a young woman to be independent and develop a sense of responsibility. Thus, the evidence suggests that although the automobile may have been used some for

medical purposes, it may have been used more for personal purposes. Under these circumstances, the petitioners have failed to show that the automobile was acquired primarily for medical purposes; therefore, the expenditures for the automobile cannot be treated as a medical expense for purposes of section 213.

The second issue for decision is whether expenditures made by their daughter for lodging and a private telephone line are deductible by the petitioners as medical expenses. Rent or the cost of an individual's lodging is usually considered to be a nondeductible personal expense. Sec. 262; sec. 1.262-1(b)·(3), Income Tax Regs. However, if the lodging is provided as a part of in-patient hospital or institutional care, it is a deductible medical expense. *John Robinson*, 51 T.C. 520 (1968), affirmed per curiam 422 F. 2d 873 (C.A. 9, 1970); *W. B. Counts*, 42 T.C. 755 (1964). The petitioners argue that Susan's stay in the rooming house and in the apartment was in lieu of her staying at a halfway house; they assume that if she had stayed at a halfway house, her expenses would have constituted deductible medical expenses. However, if Susan had been placed in a halfway house, it is not certain that the expenses of her remaining there would be a deductible medical expense. Whether the costs of remaining in an institution are deductible medical expenses depends upon the condition of the patient and the services furnished by the institution. The costs of lodging in such an institution are deductible only when the principal reason for the patient being at the institution is because of the medical care which it provides for him. Sec. 1.213-1(e)·(1)(v), Income Tax Regs. The question, therefore, becomes whether the lodging provided at the boarding house and the apartment can qualify as a medical expense under such rules.

We cannot distinguish Susan's living in either the boarding house or the apartment from her living in any other personal residence. The facilities were neither specially equipped nor specially furnished. There was no medical supervision provided to Susan and neither the boarding house nor the apartment engaged regularly in providing medical care. Although living in the facilities might have been beneficial to Susan, such benefit is not sufficient to make the lodging part of institutional medical care.

The petitioners' situation is similar to that of the taxpayers in *Robert M. Rose*, 52 T.C. 521 (1969), where a doctor recommended that the taxpayers' daughter live in a "dust-free" apartment because of her severe asthma. While the father remained in the family house, the 10-year-old daughter and her mother moved into a dust-free apartment near the hospital. While in the apartment, the mother continued to give the daughter injections of various medicines and inhalation treatments. The Court held that the lodging expenses did not qualify

as medical expenses. See *Commissioner* v. *Bilder*, 369 U.S. 499 (1962), reversing 289 F. 2d 291 (C.A. 3, 1961), and 33 T.C. 155 (1959).

In some cases, a payment for lodging has been treated as a medical expense where a hotel room or apartment has been found to be a substitute for a hospital room. In *Kelly* v. *Commissioner*, 440 F. 2d 307 (C.A. 7, 1971), reversing a Memorandum Opinion of this Court, the taxpayer, while on a business trip to New York City had an attack of appendicitis and underwent immediate surgery. Seventeen days after surgery, the taxpayer was still too weak to return to Milwaukee, his wound was still draining, and the hospital was in need of his room. The doctor, therefore, recommended that the taxpayer stay in a hotel room until he could safely return home. During the week he stayed in the hotel, the taxpayer left his room only for visits to the doctor. His wife changed his bandages, assisted him in walking and bathing, and provided him with the nursing services which he required. The Court found that the hotel room was a substitute for a hospital room. In *Sidney J. Ungar*, 22 T.C.M. 766, 1963 P-H. T.C. Memo. par. 63,159 (1963), on which the petitioners relied, the taxpayer's 90-year-old mother had suffered a cerebral hemorrhage. While she was in the hospital, the doctor said that she would receive better and less expensive care outside the hospital. The taxpayer, therefore, rented and equipped an apartment in which his mother received the nursing care which she required. The Court found that the apartment rent was "quite similar" to hospital room rent during the acute stages of an illness.

The facts in both *Kelly* and *Ungar* are distinguishable from those in the present case. The taxpayer in *Kelly* was, in essence, still a hospital patient when he was in the hotel. He had not recovered sufficiently from his operation to return home, but because the hospital was overcrowded, he temporarily continued his recovery in a substitute facility, where his wife could provide the nursing services which he required. As in the case of a hospital patient, his activity was quite limited; he left his room only when it was necessary to see his doctor. In *Ungar*, since nursing services and special equipment were provided in the apartment, the taxpayer's mother received the same type of care as she would have received in a hospital. In the present case, the taxpayers' daughter did not leave the hospital because of its overcrowding or inadequacy. Rather, as Dr. Holmes testified, she left the hospital because she no longer needed hospital care. When Susan lived in the boarding house and the apartment, she did have a job and she did begin to actively function in society. Since neither the apartment nor the boarding house was a substitute for a hospital, this case is distinguishable from *Kelly* and *Ungar*.

The petitioners argue that because the private telephone line gave Susan access to Dr. Holmes, the charges for it were a medical expense under section 213. However, they have not shown that the telephone was used primarily for the purpose of making calls to Dr. Holmes. No doubt, the phone was used to make personal calls. In the absence of a showing that its primary use was to consult Dr. Holmes, the charges for it cannot qualify as a deductible medical expense. We do not reach the question of whether the telephone charges would be deductible if the telephone was used primarily to consult with Dr. Holmes because the evidence concerning its use is not sufficient to raise the question.

As we find that neither the cost of lodging nor the telephone charges are deductible medical expenses, we need not discuss the respondent's contention that the payments should not be considered as having been made by the petitioners.

*Decision will be entered for the respondent.*