D. N. STAFFORD and Flora C. Stafford, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 77–2771.

United States Court of Appeals, Fifth Circuit.

Feb. 13, 1980.

Gilbert E. Andrews, Acting Chief, M. Carr Ferguson, Asst. Atty. Gen., Gary R. Allen, Stanley S. Shaw, Jr., Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant-appellant.

Robert L. Marchman, III, F. Carlton King, Jr., Earl T. Berry, Atlanta, Ga., for plaintiffs-appellees.

Before TUTTLE, GOLDBERG and RANDALL, Circuit Judges.

**RANDALL, Circuit Judge:**

This case is on appeal from a summary judgment entered in favor of the taxpayer[1] requiring the government to refund $78,-475.82 of income taxes for the year 1969 based upon the conclusion of the district court that a limited partnership interest received by the taxpayer, for which he did not pay cash, was issued in exchange for property within the meaning of I.R.C. § 721[2] and was, therefore, not taxable. We do not think summary judgment was appropriate in this case. Accordingly, we reverse and remand.

## I.  FACTS

In the 1960's taxpayer-appellee DeNean Stafford, who had considerable experience in developing and leasing hotels, entered into negotiations with officers of the Life Insurance Company of Georgia (hereinafter referred to as "LOG"), who were familiar with and respected Stafford's development efforts, concerning the development of a hotel LOG wished to have built on property

---

1. Since Flora C. Stafford, DeNean Stafford's wife, is a party to this proceeding only by virtue of having filed a joint return with her husband, DeNean Stafford will be referred to as taxpayer and appellee.

2. I.R.C. § 721 provides in pertinent part as follows:

   (a) General rule.—No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.

   Treas.Reg. § 1.721–1 provides in pertinent part as follows:

   (a) No gain or loss shall be recognized either to the partnership or to any of its partners upon a contribution of property, including installment obligations, to the partnership in exchange for a partnership interest. . .

   (b)(1) Normally, under local law, each partner is entitled to be repaid his contributions of money or other property to the partnership (at the value placed upon such property by the partnership at the time of the contribution) whether made at the formation of the partnership or subsequent thereto. To the extent that any of the partners gives up any part of his right to be repaid his contributions (as distinguished from a share in partnership profits) in favor of another partner as compensation for services (or in satisfaction of an obligation), section 721 does not apply. The value of an interest in such partnership capital so transferred to a partner as compensation for services constitutes income to the partner under section 61. The amount of such income is the fair market value of the interest in capital so transferred, either at the time the transfer is made for past services, or at the time the services have been rendered where the transfer is conditioned on the completion of the transferee's future services.

   . . .

   I.R.C. § 351 is an analogous section concerning the transfer of property to a corporation. Section 351 differs from § 721 in that it requires that the transferor be in control of the corporation, while § 721 contains no requirement that the transferor be in control of the partnership. I.R.C. § 351 provides in pertinent part as follows:

   (a) General rule.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property

   . . . .

adjacent to its corporate headquarters in Atlanta. In 1967, LOG's Finance Committee authorized negotiations with Stafford and approved "in principle" those negotiations that had already taken place between Stafford and LOG's officers. On July 2, 1968, H. Talmadge Dobbs, who was then the Executive Vice President of LOG, sent Stafford a letter to serve as a "letter of intent" which stated that while there were many details to be worked out, LOG wanted to continue the negotiations along the general lines it specified in the letter: (1) LOG would grant a 30-year net ground lease to Stafford or his designee (limited partnership if he desired); (2) the lease would obligate Stafford to construct a hotel complex according to plans meeting LOG's approval; and (3) LOG would make a first mortgage loan on the improvements equal to seventy-five percent of the total cost of construction at 6¾ percent interest per annum for a term to run concurrent with the lease. LOG informed Stafford by letter dated July 3, 1968, that its proposal was open for acceptance for only sixty days, during which time Stafford was to consummate all necessary arrangements. On August 30, Stafford responded with a letter which he said was evidence of "our intent to proceed toward a finalization" of all plans along the lines set out in LOG's letter, subject to further negotiations on the specific items which remained to be settled. In closing, Stafford said that when those items were resolved and plan specifications sufficient to identify the land and air rights involved were available, "we will be in a position to enter the necessary lease and contract agreements." The letter was signed by Stafford, "General Partner of Partnership to be formed."

In January of 1969, the limited partnership of Center Investments, Ltd. was formed by Stafford and others, with Stafford as the sole general partner, to build the LOG hotel. Stafford bought two of twenty units of limited partnership interests which sold for $100,000 per unit. A twenty-first $100,000 unit of limited partnership interest was assigned to Stafford, purportedly as consideration for contributing to the partnership architects' drawings or renderings, contractors' estimates and LOG's July 2, 1968 letter of intent.[3]

In 1970, LOG and Center Investments, Ltd. executed the lease and loan documents on terms differing somewhat from those outlined in the July 2, 1968 letter. The project had expanded, the amount of the loan required had increased to $7,127,500 and interest rates had escalated. The amount loaned by LOG above $5,000,000 was to bear interest at 9¾ percent. At the same time, the partnership entered into an agreement with Stouffer Food Corporation for the construction and operation of the hotel. By the terms of an amendment to the partnership agreement, Stafford received a salary beginning July 24, 1970, for his services in supervising the construction of the hotel and its subsequent operation.[4]

Stafford did not report as income the value of the twenty-first partnership interest received by him in 1969. On audit, the Commissioner of Internal Revenue assessed a deficiency against Stafford based upon its determination that the value of the twenty-first partnership interest should be treated as compensation received for his services in negotiating and developing the investment for the partnership and was thus not entitled to the benefit of non-recognition afforded by I.R.C. § 721. Stafford paid the assessment of $78,475.82, filed a timely claim for refund and, upon disallowance of the claim, filed suit in the United States District Court for the Middle District of Georgia. Confronted with cross motions

3. On appeal, Stafford does not argue that the architects' renderings or contractors' estimates constitute property within the meaning of § 721. It does not appear from the record that Stafford himself paid for either of these items. In response to the Government's request for admissions, Stafford admitted that no one paid for the contractors' estimates and that Center Investments paid the architects' fee, for which it was not reimbursed.

4. We note that the limited partnership was in existence about eighteen months before any specific provision was made in the limited partnership agreement to compensate Stafford.

for summary judgment, the district court concluded that there was no controversy concerning any material fact and granted the taxpayer's motion for summary judgment. *Stafford v. United States,* 435 F.Supp. 1036 (M.D.Ga.1977).

II. ISSUE

The ultimate issue in this case may be stated as follows: What was the consideration given by Stafford for the twenty-first limited partnership interest?[5] The narrow issue on appeal is whether the district court correctly granted the taxpayer's motion for summary judgment on the ultimate issue which is essentially a factual question.

A. Criteria for Summary Judgment

Summary judgment is appropriate only if it appears from the pleadings and supporting documentation that (1) no genuine dispute as to material facts exists and (2) such facts would entitle the moving party to judgment as a matter of law. Fed.R.Civ.P. 56(c). When the record before the court on the motion for summary judgment, including the pleadings and any exhibits, depositions, answers to interrogatories, admissions and affidavits, examined in the light most favorable to the nonmovant, contains conflicting evidence as to any material fact or as to the inferences to be drawn from basic facts, summary judgment should not be granted. *Gossett v. Du-Ra-Kel Corp.,* 569 F.2d 869, 871 (5th Cir. 1978). The burden is heavy upon the movant to establish his right to summary judgment and any doubt is resolved against him. *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.,* 606 F.2d 602 (5th Cir. 1979). Summary judgment should be granted only when it is clear what the truth is and that no genuine issue remains for trial. *United States v. Burket,* 402 F.2d 426, 430 (5th Cir. 1968). As was stated in a case where further proceedings were required to resolve the issue of fact created by controverting affidavits, " 'Cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment, as are those in which the issues turn on the credibility of the affiants.' " *Slavin v. Curry,* 574 F.2d 1256, 1267 (5th Cir. 1978) (quoting *Conrad v. Delta Airlines, Inc.,* 494 F.2d 914, 918 (7th Cir. 1974)), *overruled on other grounds, Sparks v. Duval County Ranch Co.,* 604 F.2d 976 (5th Cir. 1979) (en banc). If the jury would be free to find against the taxpayer based upon the evidence before the court, it could not be held that the facts are not in dispute. *Irwin v. United States,* 558 F.2d 249, 253 (5th Cir. 1977).

B. Contents of the Record

In the instant case, the record before the district court on the motions for summary judgment was rather extensive. Among the exhibits were minutes from some of LOG's Finance Committee meetings from the years 1967, 1968 and 1970; LOG's letter of intent to Stafford, dated July 2, 1968; LOG's addendum to that letter, dated July 3, 1968; Stafford's response to LOG, dated August 30, 1968; Center Investments' limited partnership agreement, dated January 21, 1969 and an amendment thereto, dated July 24, 1970; the assignment to Center Investments, Ltd., signed by Stafford, dated January 21, 1969; and various other documents. Also before the court were ninety-nine requests for admission by the Government to Stafford, along with his responses; affidavits of DeNean Stafford and Alton F. Irby, a friend of Stafford and the limited partner who was primarily responsible for soliciting other investors for the project; and depositions, including those of Stafford, Irby, John Williams (another lim-

---

**5.** We note that there are four possible answers to this question: neither property (within the meaning of § 721) nor services; solely services; solely property; or partly services and partly property. Should the latter answer apply, the court must make a determination of the value attributable to the property element of the transfer and allocate the value of the partnership interest received by Stafford accordingly.

*See United States v. Frazell,* 335 F.2d 487 (5th Cir. 1964), *cert. denied,* 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965) (receipt of interest in partnership capital by taxpayer-geologist held partly in exchange for services and partly in exchange for property, namely maps created by the taxpayer; remanded for value determination and allocation, 269 F.Supp. 885 (W.D. La.1967)).

ited partner), H. Talmadge Dobbs (Vice Chairman of the Board of LOG who negotiated the deal with Stafford) and Jason B. Gilliland (general counsel to LOG).

### 1. Assignment and Partnership Agreement

The assignment and partnership agreement both recite that Stafford received the twenty-first partnership unit in exchange for his capital contribution of property, namely the letter of intent, worth $100,000.

### 2. Irby's Affidavit

In his affidavit in support of Stafford's motion for summary judgment, Irby stated that the twenty-first share of the limited partnership was given Stafford as consideration for his assignment and transfer to the partnership of his rights to the lease and loan commitment from LOG. According to Irby, "it was the intent of the limited partnership that Mr. Stafford receive one share of the limited partnership in exchange for this lease and loan commitment letter, the limited partners recognizing that the economic value of the rights under this lease and loan commitment exceeded the sum of $100,000 as a result of interest savings alone." Irby further pointed out that at no time prior to July 2, 1968, was there any agreement between Stafford and the persons who ultimately became investors with respect to Stafford's negotiations with LOG concerning the project. The prospective limited partners did not agree prior to the formation of the partnership that Stafford would have a share of the partnership if he could obtain favorable terms on a lease and loan agreement with LOG. Finally, Irby stated that it was not the intent of the limited partners of Center Investments that the twenty-first partnership share was to be given Stafford in exchange for any services rendered or to be rendered to them individually or to the partnership.

### 3. Williams' Deposition

John Williams, an investor and limited partner in Center Investments, stated in deposition that it was not his understanding that Stafford received the twenty-first partnership unit because he put the deal together. According to Williams, Irby told him that Stafford was getting the extra unit for trading his commitment from LOG. Williams was apparently told that the partners had decided to "trade a share for what he [Stafford] had gotten up." On defense counsel's reexamination, Williams was asked whether he meant putting the deal together when he said "gotten up." Williams then replied "I guess you could say in a lot of ways."

### 4. Irby's Deposition

Despite the unequivocal statements in his affidavit to the effect that Stafford received the twenty-first partnership unit in exchange for property and not services, on deposition Irby indicated otherwise. When asked whether anybody received any partnership interest for anything other than cash, Irby initially answered no. According to Irby, when Stafford agreed to be the general partner, "we all began to feel that he ought to receive something that wasn't particularly tied to any situation except the fact that he had that deal from Life of Georgia to begin with . . . ." At a partnership meeting, some of the partners suggested that Stafford take an extra share. Irby related that "inasmuch as he had to run the thing, he had put it together and done it very economically, that suggestion was made, and as I recall at the meeting, everybody agreed to it with very little discussion." Irby stated that Stafford did not receive the twenty-first partnership interest in return for future services in any part because he was separately paid a salary to do that job. When asked the precise reason Stafford received the twenty-first partnership interest, Irby stated that Stafford did a considerable amount of work putting the deal together without the use of mortgage professionals or outside persons and the partnership was not paying him anything for it. As Irby recalled, the suggestion was made at a meeting that Stafford ought to be compensated and that he be given an extra share. It was not for the purpose of trying to get him to work, because he was committed to do that anyway. Irby stated: "I think what everybody was trying to do was to give him something out

of which he could realize some profit if the thing was a success, not in terms of direct monetary compensation or not as regards to his duties as a general partner." When asked whether he was aware of anything Stafford contributed to the partnership other than cash, Irby mentioned time and effort and stated that he did not know of anything else. When Stafford's counsel showed Irby the assignment, Irby acknowledged that Stafford contributed the items mentioned in the assignment. Irby understood the commitment from LOG to run to Stafford. When asked whether Stafford received anything in return for the assignment, Irby said "I don't think this assign-

ment really had anything to do with the share he got. . . . I think he was given it for, in a sense, for services to be rendered."

## III. HOLDING

As is readily apparent from the foregoing, the district court had before it conflicting evidence on the ultimate factual issue in the case: What was the quid pro quo for Stafford's receipt of the twenty-first partnership interest? Based on that evidence, a jury could have found against the taxpayer. Accordingly, summary judgment for the taxpayer was improper.[6]

REVERSED and REMANDED.

---

**6.** In order to qualify for nonrecognition, the partnership interest must have been given at least partly in exchange for property within the meaning of § 721. The taxpayer suggested and the district court adopted a broad definition of property as follows: " 'Property' can be real or personal, tangible or intangible, and a person has a property right in something if he has the right to possess it, use it and dispose of it." 435 F.Supp. at 1038. The district court cited no authority for the above definition. As noted by the district court, however, commentators have suggested that a broad definition of property should apply for purposes of the nonrecognition provisions of the Code. Neither the Code nor the regulations define "property" as used in § 721 or its counterpart § 351. It has been said, however, that "unless there is some special reason intrinsic to the particular provision (as there is with respect to capital assets), the general word 'property' has a broad reach in tax law. . . . For section 351, in particular, courts have advocated a generous definition of 'property' . . . ." *E. I. DuPont de Nemours & Co. v. United States*, 471 F.2d 1211, 1218, 200 Ct.Cl. 391 (1973). *See also* 3 J. Mertens, *Law of Federal Income Taxation* § 20.47, at 150 (rev. ed. 1972) ("known inclusions and exclusions strongly suggest that the term ["property" in § 351] encompasses whatever may be transferred"). It seems to us, however, that there are surprisingly few "known inclusions and exclusions," given the common nature of transactions of this type. The case most often cited as an example of how far courts will go in this area is *H. B. Zachry Co.*, 49 T.C. 73 (1967), which held a carved-out oil payment to be property within the meaning of § 351. Examples of other interests which have been held to be property under § 351 or its predecessor section are the following: accounts receivable, *Hempt Bros. v. United States*, 490 F.2d 1172 (3d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974); installment obligations, *Portland Oil Co. v.*

*Commissioner*, 109 F.2d 479 (1st Cir.), *cert. denied*, 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416 (1940); cash, *Halliburton v. Commissioner*, 78 F.2d 265 (9th Cir. 1935); stock, *Chrome Plate, Inc. v. District Director of Internal Revenue*, 442 F.Supp. 1023, 1027–28 (W.D.Tex. 1977); nonexclusive license of patents, *E. I. DuPont de Nemours*, 471 F.2d 1211; judgment claims or obligations surrendered to corporation for cancellation, *Duncan v. Commissioner*, 9 T.C. 468 (1947) (*acq.*); exclusive licensing of patents, *Claude Neon Lights, Inc. v. Commissioner*, 35 B.T.A. 424, 427–28 (1937) (*acq. in part, non-acq. in part*); patents, *Straubel v. Commissioner*, 29 B.T.A. 516, 521–22 (1933) (*acq.*); physical inventory, *Connolly Tool & Engineering Co. v. Commissioner*, 23 T.C.M. 1222, 1224 (1964); interest in a binding contract to purchase property, *Ungar v. Commissioner*, 22 T.C.M. 766 (1963); and, under certain circumstances, technical know-how, Rev.Rul. 64–56, 1964–1 C.B. 133. The fact that property, or a right thereto, has been earned by services will not disqualify it from the definition of property under § 721 or § 351 when it is the fruit of services rendered to a third party, rather than the corporation or partnership issuing the interest in exchange for the property. *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 3.03 (4th ed. 1979); A. Willis, *Partnership Taxation* § 10.02 (2d ed. 1976); *Roberts Co. v. Commissioner*, 5 T.C. 1 (1945) (*acq.*) (transfer of equitable interest in property earned by attorney under contingent fee agreement in exchange for corporate stock qualified as nontaxable exchange under predecessor section to § 351). *See also Garrett v. Campbell*, 360 F.2d 382 (5th Cir. 1966). The fact that property has been earned by services rendered on one's own behalf or on behalf of the corporation or partnership issuing the interest in exchange for the property will not disqualify it from the definition of property when the taxpayer has already reported it as income. *IDI Management, Inc. v.*

Commissioner, 36 T.C.M. 1482 (1977) (account receivable earned in a prior year through performance of a construction contract by taxpayer reporting income therefrom on the completed contract basis exchanged in a later year for debt securities and common stock of account debtor held property and not services).

While the district court agreed with the taxpayer's view that legal enforceability of any agreement evidenced by the letter of intent was immaterial to the question of whether it constituted property, neither the taxpayer nor the district court cited any cases, and our research has disclosed none, which stand for the broad proposition that a letter of intent, which on its face appears to be not binding on the parties, constitutes property. Viewed from LOG's standpoint, the letter of intent represented a willingness to enter into a long-term lease of the land owned by LOG adjacent to its corporate headquarters on terms favorable to the lessee and to enter into a loan agreement providing for a long-term loan by LOG at an interest rate which may appear at trial to have been a favorable one at the time the twenty-first partnership interest was issued. Viewed from the standpoint of the limited partners, the letter of intent may have represented simply an opportunity to engage in a potentially profitable project. While the letter of intent may, under these circumstances, have had value to the limited partners, it is not at all clear whether that fact would imbue the letter of intent with the status of property within the meaning of § 721. (It might be noted that "property" has been held not to include the worthless stock of a corporation which has an excess of liabilities over assets, because the requirement, in the predecessor of § 351, of an "exchange" connotes the transfer of something of value for the interest received. Meyer v. United States, 121 F.Supp. 898, 906, 129 Ct.Cl. 214 (1954), cert. denied, 348 U.S. 929, 75 S.Ct. 342, 99 L.Ed. 728 (1955).) Contrary to the opinion of the district court, we think that enforceability of any agreement evidenced by the letter of intent, while perhaps not dispositive of the question, is important and material to the question of whether Stafford transferred property to the partnership under § 721. See Ungar v. Commissioner, 22 T.C.M. 766.

The taxpayer takes the position that although enforceability of any agreement evidenced by the letter of intent is not relevant, there was in fact a binding contract between LOG and Stafford. In support of this proposition, the taxpayer cites several Georgia cases: Wolkin v. National Acceptance Co., 222 Ga. 487, 150 S.E.2d 831 (1966) (contract held one of suretyship despite designation as guaranty); Harris v. Amoskeag Lumber Co., 97 Ga. 465, 25 S.E. 519 (1895) (existence of contract found despite fact that written correspondence did not quite amount to complete and binding contract where plaintiffs gave up their claim to certain

timber and defendant cut and used it); Layton v. Morrison, 145 Ga.App. 307, 243 S.E.2d 697 (Ga.Ct.App.1978) (in view of plaintiff's total performance and defendant's partial performance, contract construed to be partly written and partly parol and therefore not void for indefiniteness); Kennedy v. Thruway Service City, Inc., 133 Ga.App. 858, 212 S.E.2d 492 (Ga.Ct.App.1975) (designation of agreement to pay rental as "Letter of Intent" of "little consequence" in determining character of agreement); and Fagelson v. Pfister Aluminum Corp., 109 Ga.App. 663, 137 S.E.2d 313 (Ga.Ct.App.1964) (contract held one of suretyship despite designation as guaranty). The district court thought it likely, but did not actually decide, that Georgia courts would have held that there was a complete and binding contract by looking at the correspondence in conjunction with oral agreements and related actions of the parties. Stafford, 435 F.Supp. at 1039 (citing Harris v. Amoskeag Lumber Co.). The fact that Georgia courts might find the existence of a contract, which subsequently is disputed by one of the parties to the alleged contract, under circumstances where there has been partial performance is not controlling and may not even be relevant for purposes of determining the federal tax liability of a party to a "contract" arising from the transfer of that contract to a partnership or corporation, particularly in view of the fact that the federal tax liability is to be judged as of the date of the transfer. See Deshotels v. United States, 450 F.2d 961, 964 (5th Cir. 1971), cert. denied, 406 U.S. 920, 92 S.Ct. 1774, 32 L.Ed.2d 119 (1972) (form and effect of a document under state law not controlling in application and interpretation of Internal Revenue Code; parol evidence not admissible to controvert words of a contract affecting taxpayer's federal tax liability despite fact that under Louisiana law parol evidence is admissible in disputes between contracting parties to explain and even reform written contracts when the writing does not conform to the true intent of the parties).

Two cases rejecting the taxpayer's theory that he transferred property to a corporation within § 351 merit special attention since they involve some of the same considerations which are present in the instant case. In Washburne v. Commissioner, 27 T.C.M. 577 (1968), the taxpayer, Washburne, president and manager of a corporation engaged in the factoring business, was orally given permission by the owner to find a buyer for the corporation. The taxpayer suggested that he be given about a 60-day option to find a buyer. Id. at 580. After the taxpayer had found a buyer and all the details of the sale had been agreed upon, he secured a letter from the first owner purporting to grant him an option to purchase the business. Id. at 582. The taxpayer then assigned the "option" to the company which purchased the factoring business in exchange for stock in that company. Id. at 582–83. The court held that the taxpayer did not have an option to

purchase the business and consequently did not transfer property within the meaning of § 351. *Id.* at 591. The court noted that the terms were too indefinite for the oral understanding to constitute an option and the letter came too late. *Id.* at 590–91. From the record as a whole, the court concluded that the stock was issued to Washburne as consideration for services rendered or to be rendered the new corporation: for bringing the opportunity to the attention of the new owners and for agreeing to continue to manage the business. *Id.* at 591.

In *James v. Commissioner*, 53 T.C. 63 (1969), the taxpayer, James, entered into an agreement with the Talbots for the promotion and construction of a rental apartment project. The agreement provided that upon completion of the project, the parties would form a corporation to take title to the project with the Talbots transferring the necessary land. *Id.* at 64. James agreed to take responsibility for the promotion of the project, including planning, architectural work, construction and loan processing. *Id.* Pursuant to the agreement, James obtained legal documents, architectural plans, a financing commitment from a mortgage company and an FHA commitment to insure the financing which, under FHA regulations, could be issued only to a corporation. *Id.* at 65–66. James signed the promissory note he issued to the mortgage company individually and as president of the corporation, although the corporation was not yet formed. *Id.* at 65. When the corporation was formed, it issued stock to James and James conveyed to it the FHA commitment, the mortgage and interim construction loan commitments, certain ar-

chitectural and construction contracts and the use of James' credit. *Id.* at 65–66. From the record it appeared that the corporation paid for the architectural and construction services and received little benefit, if any, from James' credit. *Id.* at 67 n.3. In rejecting the taxpayer's argument that by performing services, James acquired certain contract rights, notably a right to the FHA and loan commitments, which constituted property, and which James transferred to the corporation in return for stock, the court stated that James did not transfer any property comparable to a patent; he merely performed services on behalf of the contemplated corporation. *Id.* at 67–69. The court noted that throughout the arrangements it was contemplated that a corporation would be created and that the commitments would run to the corporation. *Id.* Furthermore, the FHA commitment was not his to transfer since he could not and did not acquire ownership in it. *Id.*

The latter point raises a question presented by the facts of the instant case: who had ownership rights in the letter of intent before the purported assignment, Stafford or the limited partnership? We note that summary judgment for the Government might have been proper in this case if it could have been said as a matter of law that any ownership rights in the letter of intent inured directly to the limited partnership and were therefore never Stafford's to transfer. Such a finding would obviate the necessity for resolution of the question of the property status of the letter of intent. Under the present state of the record, however, such a finding cannot be made.