D.N. STAFFORD and Flora C.
Stafford, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 76–1–VAL.

United States District Court,
M.D. Georgia,
Valdosta Division.

Nov. 19, 1982.

Carlton King, Jr., Atlanta, Ga., for plaintiffs.

Gerald B. Leedom, Tax Div., Dept. of
Justice, Washington, D.C., for defendant.

### ORDER

OWENS, Chief Judge.

This income tax refund suit brought by
plaintiffs with respect to their 1969 tax
year is before the court on remand by the
Fifth Circuit Court of Appeals. *Stafford v.
United States*, 611 F.2d 990 (5th Cir.1980).

The record has been supplemented by evidentiary hearing held on June 24, 1981, following which the parties filed cross-motions for summary judgment. Having considered the record, including the deposition transcripts, the memoranda and argument of counsel, the Fifth Circuit's opinion, and the additional showing made by plaintiffs at the June 24, 1981, hearing, the court now finds and concludes the following:

*Findings of Undisputed Material Fact*

In the 1960's plaintiff Denean Stafford began negotiating with officers of the Life Insurance Company of Georgia (hereinafter referred to as Life of Georgia) for the development of a hotel which Life of Georgia wished to have built on property adjacent to its corporate headquarters in Atlanta. Plaintiff had been in the business of developing motels in the Southeastern United States for many years and his reputation and development efforts were known to and respected by Life of Georgia officers.

On February 7, 1967, Life of Georgia's Finance Committee authorized negotiations with plaintiff and approved in principle the negotiations that had already taken place.

On July 2, 1968, H. Talmage Dobbs, who was then the Executive Vice President of Life of Georgia, sent plaintiff a "letter of intent" (Exhibit A) which stated that "[w]hile there are many details to be worked out, we would like to continue our negotiations along the following general lines." The letter of intent then summarized the status of the negotiations at that

point in time, specifically that: (1) Life of Georgia would grant to plaintiff or his designee (limited partnership if he desired) a 30-year net ground lease; (2) the lease would obligate plaintiff to construct a hotel complex according to plans meeting Life of Georgia's approval; and (3) Life of Georgia would make a first mortgage loan on the improvements equal to seventy-five percent of the total cost of construction at 6¾ percent interest per annum for a term to run concurrent with the lease. The letter of intent concluded with the statement that "[w]e will be happy to meet with you at any time for the purpose of continuing our negotiations."

On July 3, 1968, Mr. Dobbs sent plaintiff a follow-up letter (Exhibit B) advising him that the proposal in the letter of intent of July 2nd was "open only for prompt consideration" and should be considered open for acceptance for a period of only sixty (60) days.

On August 30, 1968, plaintiff responded to Mr. Dobbs' letters of July 2nd and 3rd by letter (Exhibit C) which he said was "evidence of our intent to proceed toward a finalization" of all plans along the lines set out in the letter of July 2nd. Plaintiff's letter closes with the statement that when certain items are resolved and plan specifications are available, "we will be in a position to enter into the necessary lease and contract arrangements." The letter was signed by plaintiff as "General Partner of Partnership to be formed."

On or about October 3, 1968, plaintiff's attorneys revised a proposed draft of a limited partnership agreement for Center Investments, Ltd., a proposed limited partnership with plaintiff as general partner. On page four of the revised proposed draft of the limited partnership agreement is a provision to the effect that plaintiff "has contributed property worth $100,000 for $100,000 of his contribution" to the capital of the partnership.

On October 30, 1968, a letter was sent out to prospective investors who might be interested in participating in a limited partnership to develop the hotel. The letter, which was sent by Alton F. Irby, Jr., noted that there would be 19 limited partners and one general partner (plaintiff). The letter further pointed out that plaintiff was delivering the July 2, 1968, letter of intent for what amounted to $100,000 of additional participation.

On January 21, 1969, the limited partnership of Center Investments, Ltd. was formally established by execution without change of the proposed articles of limited partnership authored by plaintiff's attorneys. Plaintiff was the sole general partner to build the Life of Georgia hotel. Twenty-one limited partnership interests were created. Twenty of these interests were acquired by investors for $100,000 per interest. Plaintiff acquired two such interests for cash. The remaining twenty-first limited partnership interest was issued to plaintiff purportedly in "exchange" for the assignment by plaintiff of the letter of intent of July 2nd to the partnership.

At no time did the investors who became limited partners on January 21, 1969, ever meet together and discuss whether or not to give plaintiff the twenty-first limited partnership interest in exchange for the assignment of the letter of intent. The limited partnership agreement that was prepared by plaintiff's attorneys and offered to the prospective investors for their signatures was in final form and stated that plaintiff "has contributed property worth $100,000 for $100,000 of his contribution."

On June 29, 1970, and July 1, 1970, Life of Georgia and Center Investments, Ltd. executed the lease and loan documents on terms differing somewhat from those outlined in the July 2, 1968, letter. The amount of the loan required had increased to $7,127,500 and interest rates had escalated. The first five million dollars of the loan was to bear interest at the rate of 6¾ percent per annum as set forth in the letter, but the amount above five million dollars was to bear interest at the rate of 9¾ percent per annum. In addition the desired size of the hotel had changed from 350 or 400 rooms to 500 rooms.

Plaintiff on his 1969 joint federal income tax return did not report the value of the twenty-first partnership interest received by him in 1969 as income. Upon audit of his return the Commissioner of Internal Revenue assessed a deficiency based upon a determination that the twenty-first partnership interest should be treated as compensation received for plaintiff's services in negotiating and developing the investment for the partnership rather than as a contribution of property in exchange for the twenty-first partnership interest. On that basis plaintiff was considered not to be entitled to the benefit of non-recognition afforded by 26 U.S.C. § 721(a) which provides: "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."

Plaintiff paid the resulting additional income taxes, filed a claim for refund and, following disallowance of the claim, instituted the instant suit for refund.

### Conclusions of Law

I. Was there the requisite "exchange" contemplated by 26 U.S.C. § 721(a) so as to entitle plaintiff to the benefit of non-recognition?

The controlling statute in this suit is 26 U.S.C. § 721(a) (hereinafter I.R.C. § 721(a)) which was set out previously. The key to the benefit of non-recognition afforded by this code section is that *property must be exchanged for an interest in the partnership.*

Assuming for the sake of argument only that the letter of intent of July 2, 1968, constituted property, plaintiff would not be entitled to the benefit of nonrecognition under I.R.C. § 721(a) unless he received the twenty-first limited partnership interest in "exchange" for the letter of intent. It is therefore necessary for the court to determine whether the transaction between plaintiff and the other investors (limited partners) concerning the letter of intent and the twenty-first limited partnership interest constituted an "exchange."

Although Congress has not defined the word "exchange" for purposes of the Internal Revenue Code, the Supreme Court has held that it should be given its ordinary meaning. *C.I.R. v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75, 82 (1965). In this court's judgment, the ordinary meaning of "exchange" is "a mutual or reciprocal transfer of one thing for another." *See,* Webster's Third New International Dictionary 792 (1971); Black's Law Dictionary 505 (5th ed. 1979). "Exchange" thus suggests that each side to the transaction has a choice as to whether to transfer the respective items of property.

In the instant case the investors who became limited partners never had any choice as to whether they would give plaintiff the additional limited partnership interest in return for his assignment of the letter of intent to the partnership. The limited partnership agreement that was prepared by plaintiff's attorneys and offered in final form to the prospective investors stated flatly that plaintiff "has contributed property worth $100,000 for $100,000 of his contribution." The investors could thus take the agreement in the form that it was offered or leave it. They had no choice.

■ Applying the ordinary meaning of the word "exchange," the court cannot conclude that the transaction in which plaintiff transferred the letter of intent to the partnership in return for the twenty-first limited partnership interest was an exchange. Had the investors who became limited partners met together and arrived at the idea of giving plaintiff the additional limited partnership interest in return for his assignment of the letter of intent to the partnership, discussed and agreed upon its value, and then requested that such a provision be made a part of the limited partnership agreement, the court's conclusion would be different.

Under those circumstances there would have been an actual exchange in which there was a *mutual transfer* or giving and in which each side had a true *choice* as to

whether to transfer or to give and the value of the transferred item. That however was not the case. Accordingly, it is the opinion of the court that the requisite exchange contemplated by I.R.C. § 721(a) did not take place.

II. Was the letter of intent of July 2, 1968, "property" for purposes of 26 U.S.C. § 721(a) so as to entitle plaintiff to the benefit of nonrecognition.

As was stated previously, the key to the benefit of nonrecognition afforded by I.R.C. § 721(a) is that *property must be exchanged for an interest in the partnership.* Assuming that contrary to this court's views the transaction between plaintiff and the other investors (limited partners) concerning the letter of intent and the twenty-first limited partnership constituted an exchange, plaintiff would still not be entitled to the benefit of nonrecognition under I.R.C. § 721(a) unless the letter of intent constituted "property" for purposes of § 721(a). In the interest of finality upon appeal it is therefore necessary for the court to determine whether the letter of intent constituted "property."

In making this determination the court is guided in particular by two points made by the Court of Appeals in its opinion: (1) that merely because the letter of intent may have been of value does not mean that it assumed the status of "property;" and (2) that the enforceability of any agreement evidenced by the letter of intent is "important and material to the question of whether [plaintiff] transferred property to the partnership under § 721." *Stafford, supra,* 611 F.2d at 996, n. 6.

After having carefully considered the arguments of counsel in conjunction with the opinion of the Court of Appeals, it is the opinion of the court that both *value* and *enforceability* are necessary to a conclusion that a document is "property" for purposes of § 721. Applying these requirements to plaintiff's letter of intent, it is apparent that at the most only one is satisfied.

The court can appreciate how the letter of intent may have been of value to a businessman, but the court fails to perceive how the letter of intent was legally enforceable. Clearly from the record the letter of intent did not evidence an agreement as to all necessary terms and conditions. Both plaintiff and Life of Georgia understood that there were further negotiations of major importance to be carried out.

██ Under the circumstances this court cannot conclude that the letter of intent attained the status of an enforceable obligation. At the most it was simply "an agreement to agree." *See, Malone Construction Co., Inc. v. Westbrook,* 127 Ga. App. 709, 194 S.E.2d 619 (1972) and *Dumas v. First Federal Savings and Loan Ass'n,* 654 F.2d 359 (5th Cir.1981). Accordingly, it is the opinion of the court that the letter of intent of July 2, 1968, did not constitute "property" for the purposes of I.R.C. § 721(a).

### Conclusion

The court is aware that under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only when it appears from the pleadings and supporting documentation that: (1) no genuine issue exists as to any material facts; and (2) such facts entitle the moving party to judgment as a matter of law. Expressed somewhat differently, summary judgment should be granted only when it is clear what the truth is and that no genuine issue remains for trial. *United States v. Burket,* 402 F.2d 426, 430 (5th Cir.1968). With this in mind, it is the court's considered judgment that defendant's motion for summary judgment should be granted.

SO ORDERED.

### EXHIBIT A

LIFE INSURANCE COMPANY OF GEORGIA

HOME OFFICE—ATLANTA

July 2, 1968

Mr. Denean Stafford
Holiday Inn of Tifton
Tifton, Georgia

Dear Denean:

This will serve as a letter of intent with reference to the construction of a hotel complex on a part of the block in which our new home office building is located. While there are many details to be worked out, we would like to continue our negotiations along the following general lines:

1. We will lease to you, or your designee, (limited partnership if you desire), the air rights sufficient for said complex over that part of the block abutting the north side of Linden Avenue and the south part of the east side of Spring Street—approximately 40,000 square feet.

2. The lease will run for a term of 30 years an annual net rental equal to the sum of the following:

(a) The number of square feet over which the hotel complex is constructed times $12.00 times 7%.

(b) Cost of the foundations devoted exclusively to the hotel complex times 7%.

(c) One-half the rental value of any underground loading or service areas to be constructed to serve the Life of Georgia Center.

3. The annual net rental will be payable in twelve equal installments and will increase each year at the rate of 1.7% compounded.

4. The lease will provide for an absolute net rental to us obligating you to pay all ad valorem taxes and assessments, keep and maintain the improvements in good repair during the entire term of the lease, and provide and maintain fire and extended coverage insurance at least equal to the current insurable value of the improvements. The lease will also obligate you to maintain such other insurance for the benefit of Lessor and Lessee as may be deemed necessary in connection with the operation of a hotel.

5. The lease will obligate you to construct a hotel complex, according to such plans, specifications and cost as may be approved by us. As you know, our original discussions contemplated approximately 350 guest rooms at a cost of around $12,-000.00 per room. Our current thinking indicates from 400 to 450 rooms and at a somewhat higher per room cost. This is a matter which will require further consideration.

6. The lease will give us the right of prior approval of any retail shops to be located in the hotel in order that there will be no unsatisfactory competition between such shops and those in the Tower.

7. We will make a first mortgage loan on the improvements equal to 75% of the total cost at an interest rate of 6¾% per annum for a term to run concurrent with the lease. The loan will be amortized in equal monthly installments of interest plus principal.

8. Prior to commencement of construction, your 25% share of the cost of improvements will be deposited in an escrow account and applied to their cost before any of the loan funds are used. The usual performance and payment bonds will be required.

9. All furniture, fixtures and other equipment used in the operation of the hotel complex will be installed at your cost, and we will be given a first lien thereon, or on any replacement or substitutions, which lien may be renewed, as required, during the term of the loan.

10. Adequate parking facilities will be made available, either in the underground parking garage located in the home office block or in a parking garage to be constructed on the northwest corner of the intersection of Linden Avenue and Spring Street. Rates for parking will be one of the matters for future determination.

We will be happy to meet with you at any time for the purpose of continuing our negotiations.

Yours very truly,

HTD:ec

cc: Mr. Jason B. Gilliland

EXHIBIT B

July 3, 1968

Mr. Denean Stafford
Holiday Inn of Tifton
Tifton, Georgia

**316**

Dear Denean:

With further reference to our letter of intent dated July 2, 1968, this is to add that the proposal is open only for prompt consideration. As we discussed recently, factors such as land value and interest rates have increased materially since our original discussions; therefore, the proposal should be considered as open for acceptance for a period of—say—60 days—to August 31, 1968.

Trusting this will be more than adequate time for you to consummate all necessary arrangements and with highest personal regards,

Yours very truly,

HTD:ec

EXHIBIT C

August 30, 1968

Mr. H.T. Dobbs, Jr.
Executive Vice President—Finance
Life Insurance Company of Georgia
Life of Georgia Tower
Atlanta, Georgia

Dear Mr. Dobbs:

This will acknowledge receipt of your letters of July 2 and 3, 1968, concerning the construction of a hotel complex on a portion of the Life of Georgia Center.

You may consider this as evidence of our intent to proceed toward a finalization of plans and specifications and the required financing, along the lines set out in your letters subject to further negotiations on the following specific items.

1. Rent value of the underground loading or service area. (Item 2c)
2. Parking. (Item 10)
3. Commencement date of rent payments on ground lease.
4. Rental options and/or lease term(s).

As soon as these items can be resolved and plan specifications sufficient to identify the land and air rights to be utilized are available, we will be in a position to enter into the necessary lease and contract agreements.

Yours very truly,
/s/ Denean Stafford
Denean Stafford
General Partner of Partnership to be formed